257 So.2d 744 (1972)
Leroy NESSMITH, Plaintiff-Appellee,
v.
CENTRAL LOUISIANA ELECTRIC COMPANY, Inc., Defendant-Appellant, and
E. J. Gunter and Wilfred "T Boy" Ardoin, Defendants-Appellees.
No. 3630.
Court of Appeal of Louisiana, Third Circuit.
January 21, 1972.
Rehearings Denied March 1, 1972.
Writs Refused April 11, 1972.
*745 Stafford, Pitts & Bolen, by John L. Pitts, Alexandria, for defendants-appellants.
Garrett, Ryland & Downs by B. Dexter Ryland, Alexandria, for plaintiff-appellee.
Gold, Hall, Hammill & Little by Jimmy M. Stoker, Alexandria, for intervenor-appellee.
Gist, Methvin & Trimble by H. B. Gist, Jr., Alexandria, for defendant-appellee.
Jones, Kimball, Patin, Harper, Tete & Wetherill by Carl Hanchey, Lake Charles, for defendant-appellee.
Before SAVOY, HOOD and MILLER, JJ.
HOOD, Judge.
Leroy Nessmith instituted this suit for damages for personal injuries sustained by him when a portable derrick, being used by his employer, came in contact with a high voltage electrical transmission line owned by Central Louisiana Electric Company, Inc. The suit was dismissed as to some defendants, but those remaining are Central Louisiana Electric Company, Inc. (Cleco), E. J. Gunter, and Wilfred "T Boy" Ardoin. Hardware Mutual Casualty Company, the compensation insurer of plaintiff's employer, intervened seeking reimbursement for the workmen's compensation benefits which it had paid to plaintiff.
Judgment was rendered by the trial court condemning Cleco to pay damages to plaintiff, but dismissing plaintiff's suit as to defendants Gunter and Ardoin. Judgment also was rendered in favor of intervenor, Hardware Mutual, for the amounts which it claimed. Defendant Cleco appealed. Plaintiff answered the appeal praying that the award of damages be increased. Hardware Mutual filed an answer to the appeal and a motion to remand to permit it to show additional payments made after the trial.
The principal issues presented are whether Cleco was negligent in failing to properly construct, maintain and insulate its main electrical transmission line at the *746 place where the accident occurred, or in failing to de-energize that line or to warn plaintiff that the main line was energized and dangerous at that point.
The accident which caused plaintiff's injuries occurred in Rapides Parish on April 23, 1968.
In 1967 the City of Alexandria entered into a contract with Layne Louisiana, Inc., under the terms of which Layne was to drill approximately 36 water wells to supply water for industrial expansion. These wells were to be located on property owned by the city near Melder, in Rapides Parish, Louisiana. Pursuant to that contract the drilling of these wells was commenced early in 1967. Plaintiff was employed by Layne at that time, and he worked as a roughneck or laborer in the drilling of these wells.
Defendant Gunter was working as a "driller" for Layne, and he was in charge of the drilling crew when the accident occurred. Defendant Ardoin was employed by Layne to work as "foreman" of that job.
Cleco has owned and maintained a 34,500 volt (34.5 KV) electrical transmission line in that area since 1956. This line is located in and along the center of a 100 foot right of way owned by Cleco, which right of way runs generally north and south, through the large tract of land on which the City of Alexandria has established its water well field. Cleco agreed to furnish the electricity for operating the pumps on the wells which were to be drilled by Layne.
The 34.5 KV main line was to provide the principal source of power for this electrical service. In order to get the electricity from the main power line to the well sites, Cleco agreed to build two substations within its right of way, directly under the 34.5 KV line, and to construct lateral or service lines running from those substations to all of the well sites. All of these lateral lines were to carry approximately 13,000 volts of electricity. The main line and all of the lateral lines were constructed in substantially the same manner. Each consisted of four wires, three of them being primary conductors and the fourth being a neutral conductor.
Cleco began constructing the lateral lines leading to the various well sites during the latter part of the year 1967. By that time most of the water well sites had been cleared, and some of the wells had been completed. Cleco had been furnished a plat showing the well sites, and from that document it had prepared another plat showing the 34.5 KV main line, the proposed lateral lines and substations, and the well sites.
The lower voltage lateral lines were never energized before April 23, 1968, and they were not energized when the accident occurred. The 34.5 KV main line had remained energized at all times except for two short periods, each lasting four or five hours and occurring on consecutive days, when the line was de-energized for the purpose of permitting the employees to tap in the substation switches. The main line served other customers in that vicinity, and arrangements had to be made by Cleco to provide electrical service to those customers during the two brief periods when the main line was de-energized to enable the substation switches to be installed.
The accident involved here occurred at a point directly under the 34.5 KV main transmission line, near one of the substations which was being constructed by Cleco. Only two well sites were located near this transmission line. The closest well was located about 53 feet from the point where the accident occurred, and the other nearby well was located about 30 feet further from the line, or about 83 feet from the place where the derrick contacted the electrical wire. The maps which were filed in evidence indicate that all other wells were located more than 1,000 feet from the 34.5 KV main transmission line, some of them being located up to two or three miles from it.
*747 The substation located near the scene of the accident consisted of a concrete slab, on which were located some posts and cross pieces made of lumber, various switches and arresters, and a large transformer. The transformer was installed in January, 1968, and it had not been energized before the accident occurred. The construction of the substation, in fact, had not been completed by that time. Plaintiff and other members of the well drilling crew knew that the transformer had not been energized, because they occasionally sat on the concrete slab and leaned against the transformer while eating their lunches. They also knew that the lateral lines which were being built had not been energized up to the time of the accident, because Layne Louisiana had provided its own portable generators in order to operate the test pumps.
There were no signs on the 34.5 KV main line warning of high voltage electricity. Plaintiff and the members of the well drilling crew had never been specifically advised that that line was energized, but neither had they been advised that it was dead. The evidence does not show that they ever made any inquiries as to whether or not the main line carried electricity. The main line was located there before the crew began drilling the wells, however, and it must have been obvious to them that it was an established electrical transmission line, located in the center of a wide cleared right of way and extending far beyond the boundaries of the property owned by the City of Alexandria. There was no road leading to the well field, and most of the members of the well drilling crew, including plaintiff, rode over and along Cleco's right of way, under or almost under the 34.5 KV main line, to get to and from the well sites every day.
On April 23, 1968, plaintiff was working at a well site located about 83 feet east of the main electrical line. The well had been tested, apparently with electrical power from a portable generator. The test had been completed, however, so on that day the test pump and other testing equipment were being removed from the well. A portable derrick mounted on a truck was being used to remove the well head or test pump, since it weighed over 1,000 pounds. The procedure which the crew planned to use was to lift the well head with the portable derrick and put it on a flat bed truck so it could be transported away. Plaintiff was assisting in these operations.
The ground was muddy around the well site, so after lifting the test pump with the portable derrick, the derrick truck was moved west about 80 feet to a point in the middle of the electric line right of way where there was higher ground. The derrick truck was then brought to a stop directly under the 34.5 KV main line. The boom of the truck was 33 feet long, and the lowest wire in the main line at that point was approximately 31 feet from the ground. While the truck was stationed in that position, the driver began to raise the derrick to lift the well head, and the derrick came in contact with the live wire above the truck. One member of the crew was electrocuted, and other members of the crew were severely burned. Plaintiff was not touching the truck at the time contact was made, but he nevertheless received a severe electrical shock and other injuries, from which he has developed a traumatic neurosis.
Gary Carlos Wright, an employee of Layne, was driving the truck when the accident occurred, and defendant Gunter, a driller employed by Layne, was supervising and directing the crew in their undertaking to move the well head and equipment.
This suit was filed exactly one year after the accident occurred. It was tried in March and April, 1971.
The trial judge found that the 34.5 KV main line had been properly constructed and insulated. After noting the high degree of care owed by the operator of a high voltage electric line, however, he concluded that Cleco should have reasonably anticipated an accident of this kind, and *748 that it was negligent in having failed to warn plaintiff and other workmen in that area "of the existence of one activated potentially lethal wire which could be very easily confused with numerous other wires in the immediate vicinity." The court concluded that "signs could be put on the poles bearing the wire through which this current is conducted," and that Cleco was negligent in having failed to provide such a warning. The judge based this finding of negligence primarily upon Rule 211 of the National Electrical Safety Code, and upon the case of Allien v. Louisiana Power & Light Company, 202 So.2d 704 (La.App. 3 Cir. 1967).
Rule 211 of the National Electrical Safety Code provides that: "All electric supply and communication lines and equipment shall be installed and maintained so as to reduce hazards to life as far as practicable."
We do not feel that there has been a violation of the above quoted rule. The height of the line at the place where the accident occurred (about 31 feet) exceeded the 17 to 22 foot minimum standard prescribed by the National Bureau of Standards, and the evidence does not show that there was any necessity of constructing it at a greater height. The line at that point traversed a heavily wooded, uninhabited area, through which there was no traffic. There was no requirement that the wires be insulated, and one expert testified that it is not standard practice to insulate high voltage lines under the circumstances which existed here. The evidence thus convinces us that the transmission line was installed and maintained "so as to reduce hazards to life as far as practicable."
We distinguish the facts and issues presented here from those which were presented in Allien v. Louisiana Power & Light Company, supra. There, the defendant constructed an electrical power line leading to a point within 26 feet of an abandoned oil well. It then discovered that the line had been installed in the wrong place and could not be used. Although this line was never used, it was left in place and was later energized. When the decedent's crew came to rework the abandoned well, a derrick contacted the unused line and the decedent was killed. We concluded that the defendant was negligent in permitting the line to remain energized, since it was located so close to an oil well which the power company knew or should have known would have to be reworked periodically with portable rigs, and since "the power line in question had no utility whatever and could have been removed at a nominal cost."
In the instant suit, unlike Allien, the transmission line was constructed and was put into operation long before the first water well was drilled. The water well which was drilled later by Layne was located further from the electric line than was the oil well in Allien, and there was no reason for Cleco to suspect that a derrick would be raised at any point within its 100 foot right of way either for the drilling or reworking of that well. In the present suit there was a utility and need for the 34.5 KV main line. It should have been obvious to plaintiff here that the Cleco main line was being used while it was obvious in Allien that the small service line involved there was not being used, and in this case Cleco's main line could not have been removed at nominal cost.
The operator of high voltage electric lines is required to use the utmost care to reduce hazards to life as far as is practicable. Bordelon v. Continental Casualty Company, 229 So.2d 761 (La.App. 3 Cir. 1970); Calton v. Louisiana Power & Light Company, 56 So.2d 862 (La.App. 2 Cir. 1952), amended and affirmed, 222 La. 1063, 64 So.2d 432 (1953); Stansbury v. Mayor and Councilmen of Morgan City, 228 La. 880, 84 So.2d 445 (1955).
In places where it should be reasonably anticipated that persons may contact electric lines, the operator of those lines is required to insulate them, or to give adequate *749 warning of the danger, or to take other proper and reasonable precautions to prevent injury. Bordelon v. Continental Casualty Company, supra; Stansbury v. Mayor and Councilmen of Morgan City, supra; Thomas v. Gulf States Utilities Company, 128 So.2d 323 (La.App. 1 Cir. 1961).
The operator of a high voltage line, however, is not required to guard against hazards which cannot be reasonably anticipated. Bordelon v. Continental Casualty Company, supra; Allien v. Louisiana Power & Light Company, supra; Boone v. New Orleans Public Service, Inc., 109 So.2d 800 (La.App.Orl.1959); Webb v. Louisiana Power & Light Company, 199 So. 451 (La.App. 2 Cir. 1940); Calton v. Louisiana Power & Light Company, supra.
Mr. Ambrose Ramsey, an electrical engineer called by plaintiff, testified that the presence of one energized line among a number of de-energized lines constituted an unusual hazard. The substance of his testimony is that Cleco should have advised the supervising personnel of Layne which lines were energized and which ones were dead, so that these supervisors could have given that information to Layne's employees. Mr. Ramsey conceded, however, that "all lines should be treated as energized, even though they know otherwise, you should not ever deliberately come in contact with a wire," and that "everybody ought to treat a line as being energized."
Mr. Ben Z. Segall, a mechanical engineer who has had extensive experience in working on and with high voltage electric lines, was called by defendant. He testified that it is common for there to be some energized and some de-energized high voltage lines at construction projects. The basic rule among workers around electric lines, he stated, is that every electric line or wire must be regarded as being alive or energized unless the person knows that it is dead. He testified that high voltage lines are seldom insulated, and that the standard practice among electrical workers is that "they consider everything hot, and the only time they are convinced that these lines are dead is when they themselves test these lines out." He also stated that the only places where warning signs are customarily installed on high voltage lines are around substations or towers, where children might be tempted to climb up to the overhead wires.
Mr. C. J. Sellers, the area senior engineer for Cleco, testified that Daigre and Associates, engineers for the city's well drilling project, contacted Cleco in 1967 and requested that electrical power be furnished to test the wells which had been drilled. Sellers stated that the request was declined, and that Daigre and Associates was informed at that time that the only power which Cleco had in that area was the 34.5 KV main line which ran through the well field. It is apparent from his testimony, therefore, that the project engineer was informed by Cleco that the main transmission line was energized. It is reasonable to conclude that some officers or agents of plaintiff's employer, Layne, also received this information, because it became necessary for Layne to bring in portable generators to make the tests after Cleco rejected its request that electric power be furnished from the main line. Sellers stated that in any event he knew of no reason why Layne employees should ever have had to work under the transmission line.
Mr. Arthur E. Meyers, an engineer employed by the project engineers, Daigre and Associates, testified that he negotiated with Cleco for electric power to test the wells at the request of Ronald Cook, an agent of Layne, and that during those negotiations Cook was informed that the power source for the wells would have to come from Cleco's 34.5 KV main line. Plaintiff's employer thus had been informed of the fact that Cleco's main transmission line actually carried electricity and that it was not dead.
The evidence establishes, we think, that the officers or agents of Layne had *750 been notified long before the accident occurred that the 34.5 KV main line had been energized. There thus is no merit to plaintiff's argument that the Layne employees were never advised that Cleco's main line carried electricity.
Assuming, however, that no such formal notice was ever given by Cleco to Layne or its employees, we have concluded that no warning signs or formal notices were required under the circumstances presented here, and that Cleco thus was not negligent in failing to post signs or in failing to specifically advise Layne that the main line was energized.
Plaintiff and other members of his crew knew that the 34.5 KV main line was an established electrical transmission line. They travelled to and from work many times along the Cleco right of way, under or almost under this established transmission line. They were aware of the fact that that line existed and that it was being used to distribute electricity before the first water well was drilled, and before the first lateral line was constructed. They had no reason to assume that the line had ever been de-energized before the accident occurred. Under those circumstances we feel that Cleco was under no duty to formally notify plaintiff or any other member of the crew that it would be dangerous to come in contact with these high voltage wires.
We agree with the experts who testified that a person who works around an electric transmission line should regard that line as being live or energized unless and until it has been clearly shown that the line is dead. In this case Cleco did nothing which could have misled plaintiff or members of the Layne drilling crew into believing that its main transmission line had been de-energized. The purpose of an electric transmission line is to carry an electrical current, and the mere existence of such a line constitutes adequate notice of the fact that it does carry electricity, or at least that it is highly probable that the line is energized, and that it would be dangerous to come in contact with it. We believe that, in the absence of some peculiar and unusual circumstances, the owner or operator of such a transmission line is not required to post warning signs all along its lines or on all posts advising that the line is energized. We concede that warning signs or specific notice of the danger might be required under some unusual circumstances, but we find that no such unusual circumstance existed here.
Defendant Gunter, who worked for Layne and was supervising the drilling crew when the accident occurred, admits that he was aware of the danger, and he testified that the only reason he allowed the derrick to come in contact with the main transmission line was that he "forgot about the line." His testimony, in part, is as follows:
"Q: When you realized, when you told the truck driver to move on up there and raise his derrick, you kneweven though you assumed that it wouldwas not energized up above, you knew you might strike that line with that derrick, didn't you?
"A: Yes, sir. Right at the time I had forgot about the line, if I'd even thought about the line being up there I wouldn't raised the derrick. It if had been dead or alive or what.
"Q: Well in other words it was momentary forgetfulness on your part to raise it under the line, is that right?
"A: Right.
"Q: In other words if you had known that when the derrick was raised it would have hit the line, it was directly under it, you would not have done it, is that correct?
"A: That's right."
We find that Cleco had no reason to anticipate that Layne would perform any work at all within 50 feet of its main transmission line, and that it particularly had no reason to suspect that Layne would *751 erect a derrick directly under that line. The main transmission line ran along the center of a 100 foot right of way, and the wires were suspended at least 31 feet above the ground. The plans showed that no well was to be drilled in the right of way, and none were drilled within its boundaries. Only two of the 36 wells drilled by Layne were located within, 1,000 feet of that servitude. There thus was no apparent reason for a derrick to be raised within the limits of that servitude, and we find that Cleco should not be held to have been negligent because it failed to anticipate that members of the Layne drilling crew would come in contact with its lines.
Our ultimate conclusion is that defendant Cleco could not reasonably have anticipated that the drilling crew would come in contact with its transmission line, and that it thus was not negligent in failing to post signs or to give any additional warnings of the danger to plaintiff or to other members of that crew.
It is unnecessary for us to consider the question of whether Gunter and Ardoin are liable to plaintiff. Judgment was rendered dismissing the suit as to both of these defendants. Plaintiff has not appealed from that judgment, and he has not sought any relief against either of them in his answer to this appeal. The judgment of dismissal as to Gunter and Ardoin thus has become final.
For the reasons herein set out, the judgment appealed from is reversed in part, and is affirmed in part, as follows: (1) We reverse that part of the trial court's judgment which condemns defendant, Central Louisiana Electric Company, Inc., to pay damages to plaintiff, Leroy Nessmith, and judgment is hereby rendered rejecting plaintiff's demands against that defendant, at plaintiff's costs; (2) we reverse that part of the judgment appealed from which decrees that defendant, Central Louisiana Electric Company, reimburse intervenor, Hardware Mutual Casualty Company, for the compensation benefits and medical expenses paid by said intervenor, and judgment is hereby rendered rejecting the demands of Hardware Mutual Casualty Company; (3) the remaining parts of the judgment appealed from, that is, the parts which we have not specifically reversed or amended here, are affirmed. We specifically affirm that part of the trial court's judgment which dismisses the suit as to defendants E. J. Gunter and Wilfred "T Boy" Ardoin, and that part which fixes the expert witness fees and taxes those fees and other expenses as costs of this suit.
The costs of this appeal are assessed to plaintiff-appellee.
Affirmed in part and reversed in part.