390 So.2d 1265 (1980)
Sandra Leblanc SIMON et al.
v.
SOUTHWEST LOUISIANA ELECTRIC MEMBERSHIP CORPORATION et al.
Nos. 67311, 67356.
Supreme Court of Louisiana.
October 20, 1980.
Rehearing Denied December 15, 1980.
*1266 Oscar W. Boswell, II, Harrington & Boswell, Crowley, for plaintiff-applicant in No. 67311; for plaintiff-respondent in No. 67356.
Larry T. Richard, Cline, Miller, Richard & Miller, Rayne, for plaintiff-applicant in No. 67356 and for plaintiff-respondent in No. 67311.
Lawrence G. Pugh, Jr., Pugh & Craton, Crowley, J. J. Davidson, for defendants-respondents in both cases.
BLANCHE, Justice.
Plaintiffs in these two lawsuits are the wives and minor children of two Acadia Parish residents who were fatally electrocuted on June 8, 1975. Plaintiffs respectively brought suits in damages for the wrongful death and for the survival action of Marvin G. Vincent and Harold John Simon against Southwest Louisiana Electric Membership Corporation (SLEMCO), the owner of the electric lines which transmitted the fatal shocks, and its insurer, United States Fidelity & Guaranty Company. The electrocutions occurred on a lot in Pine Acres subdivision near Crowley, Louisiana when a drilling pipe came in contact with, or close proximity to, an uninsulated electrical line in the course of a water well drilling operation undertaken by family members and friends of lot owner, Michael Vincent. Marvin Vincent, a brother of Michael Vincent, was electrocuted during his participation in the removal of the drilling pipe from the well hole, and Harold John Simon died from electrical shocks he received when he attempted to rescue Marvin and other persons injured in the accident.
The two lawsuits brought by decedents' survivors were consolidated and tried before a jury in the Fifteenth Judicial District Court, Parish of Acadia. The jury returned a verdict for defendant in both instances, finding no liability on the part of SLEMCO for the deaths of Vincent and Simon. In reviewing that jury verdict, the Third Circuit Court of Appeal ruled that the verdict was not erroneous as a matter of law. 380 So.2d 1242. We affirm for the following reasons.
The undisputed facts reveal this chain of events: Michael Vincent planned to drill a water well on his land with the aid of family members and friends. The chosen drilling site proved to be approximately fifteen feet away from a point on the ground where a charged SLEMCO electrical line hung 25.1 to 26.7 feet above the ground. A few days prior to the actual drilling operation, SLEMCO employees were working near the proposed drilling site when they were informed by Percy Vincent, the father of the landowner, Michael Vincent, that they planned to drill a well there. The well had been "started", or marked, by broken ground and the SLEMCO employees were persuaded by Percy Vincent and his offer of $5.00 to drill down a few feet through the harder ground with a mechanized auger attached to the SLEMCO truck.
On Sunday, June 8, 1975, the actual completion of the drilling took place along with a Vincent family gathering and barbeque. The persons engaging in the drilling effort were Michael Vincent, his brother, Marvin (one of the decedents), their brother, Heulan, their father, Percy, Bufford Richard and Jerry Thompson. Harold John Simon, the other decedent, prepared the barbeque for the gathering. The parties employed a method of drilling more common in earlier times whereby lengths of 3/4-inch pipe were *1267 attached to a hand-turned auger as the auger dug deeper into the ground. These lengths of pipe and auger were periodically pulled out of the hole so that the accumulated mud and sand could be removed from around the auger. When the flexible ¾-inch drilling pipe became lengthy, one of the men stood on a ladder to balance it as the entire pipe was pulled out of the hole, the auger cleaned, and the pipe fed back into the hole. It was a slow process, and approximately seven hours was spent before the desired depth was reached.
The accident occurred when the pipe was removed for the final time before plastic casing could be placed in the well hole. The pipe had, at this point, reached a length of about 42 feet. Heulan Vincent was balancing the pipe as it was removed from the hole. He stood on the ladder and grasped the pipe at approximately 18 feet above the ground. When the drilling pipe was completely removed from the hole, about 24 feet of it extended above his grip. This portion of the pipe apparently swayed over toward the nearby electrical lines as the men attempted to begin laying it down on the ground.
Electricity was transmitted through the drill pipe, fatally shocked Marvin Vincent, and injured other parties aiding in the drilling. When Harold John Simon saw what had happened, he attempted to remove the pipe with his hands from where it had fallen onto the bodies of some of the men. Upon his second attempt he, too, was fatally shocked.
There is a direct conflict in the testimony or inferences from the facts on the following key points. SLEMCO employees testified that they warned Percy Vincent, the father of the owner of the land where the well was drilled, that the selected well location was near the electric lines in question, that the lines were charged, and that it would be dangerous if any contact was made with these lines. They allegedly gave this warning when they were working near the well site a few days prior to the planned drilling and when they agreed with Percy Vincent to drill "a ways down into the ground" with the SLEMCO truck auger. Percy Vincent maintained that the SLEMCO employees gave him no such warning.
The other major area of dispute was as to the visibility, or the knowledge, of the drilling party's members of the existence of the electrical lines near the well site. All witnesses for the plaintiffs who participated in the drilling testified that they had never seen the wires and were unaware that they were there. The facts indicate that these lines were only approximately 15 feet from the well where the workers drilled for about 7 hours prior to the accident. Further, as related above, the drilling pipe was periodically removed from the hole and balanced in the air by a person grasping the pipe 18 feet above the ground on a ladder. The participants in the drilling operation would, therefore, have cause to frequently look upward in the course of their efforts. Although Percy Vincent was one of the drillers who testified he did not know there were power lines near the well site, SLEMCO employees testified they informed him of the existence of these lines. Finally, a photograph of the scene of the accident introduced in evidence by the defense depicts the electrical lines. These lines were slightly obscured by trees, but appear to be visible to even a casual observer working nearby.
We recognize that electric companies who utilize and maintain high power lines are required to exercise the utmost care to reduce hazards to life as far as is practicable. Nessmith v. Central La. Electric Co., 257 So.2d 744 (La.App.3d Cir. 1972), writ den., 259 So.2d 921, 922 (La.1972). If it should be reasonably anticipated that persons may come into contact with electric lines, the operator of those lines is required to insulate them, or to give adequate warning of the danger, or to take other proper and reasonable precautions to prevent injury. Nessmith, supra. However, an electric company is not legally bound to safeguard against occurrences that cannot be reasonably expected or contemplated. Bordelon v. Continental Casualty Co., 229 So.2d 761 (La. App.3d Cir. 1969), writ den., 231 So.2d 396 *1268 (1970). We agree with the court of appeal that operators of power lines are not required to anticipate every possible accident which may occur and are not the insurers of safety of persons moving around power lines in the course of everyday living.
The power line in question was 26.7 feet above the ground at the point of contact with the drilling pipe, a height of 11.7 feet in excess of the requirements of the National Bureau of Standards Safety Rules for the Installation and Maintenance of Electrical Transmission Lines. Compliance with these safety standards does not, per se, relieve SLEMCO from negligence, and SLEMCO must take additional steps to protect persons from injury due to contact with power lines where the surface below the lines is used for reasonably foreseeable purposes. McKowen v. Gulf States Utilities Co., 358 So.2d 675 (La.1978). In 1940, when wells were more commonly drilled by the method utilized in the case at hand, the Second Circuit Court of Appeal was confronted with a factual situation similar to the instant case. Under the facts of Webb v. La. Power & Light Co., 199 So. 451 (La.App.1940), the plaintiff's husband and friends had removed a well pipe from a well hole and contacted an electrical line 24 feet above the ground and 18 feet away from the well hole. The court resolved the issue of foreseeable use and liability in favor of the defendant electric company, reasoning as follows:
"It appears to us that defendant fulfilled all legal duties imposed on it. Although the wires in question were not insulated, there was a compliance with the other alternative, namely, the placing of them beyond the danger line of contact with human beings. While engaged in the ordinary course of their affairs, pedestrians would experience no harm from them. Defendant could not have reasonably anticipated that decedent would withdraw from the ground connected well pipe of a length, here more than 30 feet, that would make contact with the transmission line. On the contrary, it could have reasonably expected that in the event of the pulling of the pipe from the well, a disassembling of it, joint by joint, would be the course pursued." Webb, at 453.
It is admitted by all persons testifying on point in the case at hand that the lengths of pipe could have been disassembled from each other one at a time rather than removing the entire connected pipe from the hole at once.
Plaintiffs contend that their case is distinguishable from the Webb, facts. The alleged distinction is that SLEMCO was apprised, through its employees' conversation with Percy Vincent, that a dangerous well-drilling operation would be undertaken on the Vincent property. Due to this knowledge, plaintiffs argue that SLEMCO had a duty to deenergize a line which, as admitted by SLEMCO, would deprive only one customer of service. Under the facts of this case, we find that SLEMCO owed no duty to decedents to ascertain the exact time of drilling and deenergize its line.
It is true that SLEMCO may be charged with the knowledge of its employees that a well would be drilled on the Vincent property approximately fifteen feet from the SLEMCO power lines. However, the employees testified that they warned Percy Vincent to take care in the planned drilling operation and warned him of the potential danger should contact be made with the electric lines. Percy Vincent is the well site landowner's father, he was present at the well site a few days prior to the drilling when he requested SLEMCO to aid him in drilling a portion of the well at the point he indicated and he, in fact, participated in the actual well-drilling operation the day of the accident. Under the circumstances, this warning by SLEMCO employees to this individual, coupled with SLEMCO's placement of these lines so that their presence was apparent to others, were sufficient to discharge the duty of care owed to the decedents by SLEMCO.
Plaintiffs cite the case of Boure v. New Orleans Public Service, Inc., 255 So.2d 776 (La.App.4th Cir. 1971), writ ref. 257 So.2d 432 (La.1972), in which the court of appeal *1269 found a warning by an electric supplier insufficient and found it incumbent upon that supplier to deenergize its lines. We find the Bouré case distinguishable from the instant case. In that case, a painter received an electrical shock when a spray paint apparatus he was operating came in contact with a "live" wire while he was painting the underside of an interstate bridge. The key factual distinction between Bouré and this case is that in Bouré, the supplier of electricity was aware of the painting operation in progress, and was aware of the continuous close proximity of the painters to the electric wires as they proceeded, for weeks, to paint the bridge. The facts in the case at hand show that SLEMCO had no notice of the exact time of the drilling operation, had no knowledge of the depth to which the well was to be drilled or of the type of drilling equipment or method to be used, or how close that equipment could potentially come to the high wire lines placed 26 feet above the ground and, certainly, SLEMCO did not observe the one-day drilling operation in progress.
As we view the record, and as did the court of appeal, there is sufficient evidence to support a jury determination that SLEMCO was free from negligence in this case. The jury apparently resolved conflicting testimony against the plaintiffs and in favor of the defendants. We regard such a resolution of conflicting evidence as one of the essential functions of a trier of fact and find no manifest error in the conclusion of the jury.
Since we rule that the evidence supports a finding that SLEMCO was free from negligence, it is unnecessary to discuss any potential contributory negligence on the part of either of the decedents. Also, as the court of appeal noted, although Harold John Simon was a rescuer and, therefore, occupies a special status in the law, none of the plaintiffs may recover where SLEMCO is found to be free from any negligence.
For the above reasons, the decision of the court of appeal is affirmed.
AFFIRMED.
DIXON, C. J., and CALOGERO, J., dissent.
WATSON, J., dissents and assigns reasons.
WATSON, Justice, dissenting.
This matter is factually indistinguishable from Bouré v. New Orleans Public Service, Inc., 255 So.2d 776 (La.App. 4 Cir. 1971) writ refused 257 So.2d 432 (La.1972). Slemco's employees knew exactly where this water well was to be dug. Slemco's employees also knew that the drilling would take place that Sunday. Slemco's employees probably knew how the well would be drilled, that is, with a hand turned auger, because they started the well with their mechanical auger. These employees were aware of the danger; their testimony was that they warned Percy Vincent, the father of the landowner.[1]
Since Slemco, through its employees, knew the day and location of the proposed drilling, they should have re-energized the "hot" line. In Bouré, New Orleans Public Service offered to de-energize its line. It is undisputed that this possibility was not mentioned to the Vincents by Slemco's employees. Slemco had knowledge of the proposed activity adjacent to its dangerous line. Its employees were aware of the hazard. Otherwise, they would not have warned Percy Vincent. The warning to him was of no benefit to the others. It was not communicated to them. The danger should have been foreseen by Slemco. Slemco admitted in answers to interrogatories *1270 that they had turned off electric current in a line when similar activities were taking place and no reason is shown for not doing so here.
Slemco's "hot" line did not, in and of itself, pose an unreasonable risk of injury. However, when Slemco became aware through its employees of the proposed drilling activity, failure to shut off the power in the line that Sunday created an unreasonable risk of foreseeable harm. Allien v. Louisiana Power & Light Co., 202 So.2d 704 (La.App. 3 Cir. 1967) writ denied 251 La. 392, 204 So.2d 574. The utility of the line to the one customer it served was outweighed on this particular day by the hazard it presented to those drilling the well. Balancing the two, it is clear that Slemco should be strictly liable for the harm. Contributory negligence is not a defense to strict liability. See Rodrigue v. Dixilyn Corp., 620 F.2d 537 (5 Cir. 1980). Here, as in Dixilyn the jury was erroneously charged that contributory negligence would bar plaintiff's recovery. Even if there were a voluntary assumption of a known risk on the part of those actively engaged in drilling the well, this would not bar recovery by rescuer Simon, who disregarded the danger and lost his own life trying to save his friends.
I respectfully dissent.
NOTES
[1] There is some question whether a warning was actually issued. When John LeJeune was called on cross-examination he refused to repeat his earlier testimony to that effect. See page 163 of the transcript:

"Q. Isn't it a fact Mr. LeJeune that you did not tell Percy Vincent, Michael Vincent, or Marvin Vincent anything at all about that hot line.
"A. (No response).
"Q. Isn't that a fact?
"A. (No response)."