JOHN S. COVINGTON, Judge.
This is a suit for personal injuries sustained when plaintiff, Richard Frazee, came into contact with high voltage power lines owned by defendant, Gulf States Utilities Company (GSU). From a unanimous jury verdict finding no fault on the part of defendant power company, plaintiff has de-volutively appealed.
FACTS
On the day of the accident, December 1, 1978, Frazee was employed as an ironwork-er by Crane and Steel Erectors. Frazee had been an ironworker for 18 years and was sent to this job by his union in response to a request by Crane and Steel Erectors for qualified ironworkers. Crane and Steel Erectors was a sub-contractor on a new office building. This building was partially constructed when Frazee began work, and he had been on the job for three weeks when he was injured.
The job site was located in Baton Rouge between Lobdell Avenue and Airline Highway, across from the old downtown airport facility on Goodwood Boulevard. The lot on which the building was being constructed is approximately 200 feet deep with relatively dense foliage including several large oak trees across the back of the property. Adjacent to the rear of the lot is a ten-foot-wide utilities servitude, in which air space G.S.U. owns and opérates seven power lines running west to east, parallel to Good-wood Boulevard. These are 7,620 volt lines and are uninsulated, or in other words, “hot” lines.
These power lines were located in the rear of the construction site, within the dedicated servitude, approximately 60 feet behind the building being constructed. There is some question as to the visibility of the wires due to the oak trees, however it is clear from the record that everyone on the job site, including Frazee, was aware of the existence and location of the wires.
A 15 ton crane or “cherry picker” was used at various times during the construction of the building. On December 1, 1978 the cherry picker had completed its intended use and a call had been placed for a truck to come pick it up. Crane and Steel Erectors decided to take advantage of the cherry picker while it still could and ordered one of its crews to use the crane to transport some bales of wire mesh from the ground to the building’s second floor. Frazee and other members of his crew were through for the day and about to “knock off” when they were instructed by Crane and Steel Erector’s foreman (A.W. Watson) to move the wire mesh.[1]
The bales of wire mesh were located in the southeast corner of the lot, very nearly underneath the power lines. The crane was moved to a point between the building and the bales on the south side of the building about 45 feet from the back of the lot. The crane operator had extended the cherry picker’s boom out approximately 50 feet for the lifting operation. There is evidence that Frazee remarked about the need for extra caution because of the fact *50 that they would be working so close to the wires.
Frazee and a co-worker alternated in attaching the bales to the crane by means of a three-foot-long hook attached to the crane’s load line (a steel cable). Frazee and his co-worker took turns in grabbing the hook and guiding it to the bale to be lifted. Several bales were attached and lifted from the ground to the second floor without incident. The accident apparently occurred when Frazee grabbed the hook and pulled the load line into contact with the overhead wires. While there is some disagreement as to whether Frazee pulled the load line into contact with the wires or whether the electricity running through the wires “arced” into the load line, it seems most likely that Frazee caused the contact between the load line and wires. If the load line had come into contact with the power lines before Frazee grabbed the hook, the electricity would have grounded through the cherry picker before he had a chance to touch the hook. There was also no evidence of arcing at the time of the accident. Determination of the actual details of the accident is not, however, significant to the outcome of the case.
After the accident Frazee was rushed to Baton Rouge General Hospital where he remained in the Burn Unit for 23 days. Five to seven per cent of Frazee’s body sustained second and third degree burns, mainly concentrated on his left arm and hand, left thigh, left foot, right forearm, both great toes, and his face — particularly his nose and forehead. He sustained a compression fracture of the fifth dorsal vertebrae, about level with his shoulder blade. He developed electric shock cataracts which reduced his vision within the space of a few months from 20/20 to 20/400.
Frazee has had to have numerous operations including skin grafts, plastic surgery, and cataract removal. He had to wear a back brace for 8 months and he now needs to wear glasses. With these prescription lenses, Frazee has corrected vision of 20/25, but he has almost no peripheral vision. He also suffers from severe emotional problems as a result of his traumatic injuries. In spite of three separate plastic surgery operations Frazee still has disfiguring facial scars, and his plastic surgeon, Dr. Joel D. Nasca, testified at the trial that plastic surgery has done all that could be done to improve the physical appearance of Frazee.
ASSIGNMENTS OF ERROR[2]
Frazee contends that the trial judge erred in:
1. not granting a mistrial after plaintiff’s expert based his testimony on incorrect information supplied by defense counsel;
2. in allowing defense counsel to address and admonish the jury in an attempt to explain and correct the misinformation;
3. in refusing to give plaintiff’s requested jury instructions numbers 4, 8, 9, 18, and 21, and in giving G.S.U.’s requested jury instruction number 2;
4. in allowing Otis McKnight to give opinion testimony over objection when he was not tendered as an expert.
Frazee also contends that the jury erred in:
5. holding that G.S.U. was not guilty of fault in this matter.
ASSIGNMENTS OF ERROR NOS. 1 and 2
Frazee contends that the trial judge should have granted a mistrial after plaintiff’s expert, Dr. Mazer, based his testimony on incorrect information supplied by G.S.U. Frazee also claims that the trial judge erred in allowing defense counsel to address the jury and explain that a mistake had been made.
During discovery, G.S.U. was requested to provide plaintiff with certain circuit breaker information for use by one of his *51 expert witnesses. G.S.U. inadvertantly .provided the wrong charts. Dr. Mazer reviewed this incorrect fuse and relay chart, determined how it would act with a ground fault and overload problem, and testified as to his findings. After Dr. Mazer’s testimony, defense counsel discovered the error and immediately notified the trial judge and opposing counsel in chambers. Dr. Mazer was provided with a copy of the correct chart and given an opportunity to review this new material. Before Dr. Mazer gave his corrected testimony, defense counsel explained to the jury what had happened and accepted personal responsibility for the mix-up. It was stressed that the blame was entirely on the defendant.
Dr. Mazer was then allowed to testify concerning the correct chart. This line of questioning was one of clarification rather than routine cross-examination. The gist of Dr. Mazer’s testimony is that had the power lines been fused, the fuse would have reacted faster than the circuit breaker used on the line. The point was that fuses trip faster than circuit breakers, and this conclusion remains the same under both of the charts. The only difference in Dr. Mazer’s testimony was the time it would take for either a circuit breaker or a fuse to trip. Using the correct chart, Dr. Mazer indicated that the circuit breaker would trip three times faster than he had calculated using the wrong chart.
The power lines involved in the accident comprise a part of the Jefferson Substation. The Jefferson Substation utilizes circuit breakers rather than fuses, because, according to G.S.U., these are distribution lines which are not designed to be fused. Furthermore, the evidence is that had the line been fused, Frazee would still have received an electrical shock with the only difference being possibly the duration of the shock and the extent of the injuries caused by it, depending on the development of the total amperage necessary to blow the fuse.
As there was no evidence that the use of a circuit breaker rather than a fuse was a negligent or substandard practice, nor was there evidence that the circuit breaker involved was defective, it is clear that this portion of Dr. Mazer’s testimony was basically irrelevant to the outcome of the trial. Thus we do not find that the trial judge abused his discretion in refusing to grant a mistrial.
Frazee also contends that the trial judge erred in allowing defense counsel to address the jury in conjunction with this matter and in failing to admonish the jury concerning defense counsel’s conduct. G.S.U. and defense counsel did not intentionally supply plaintiff’s expert with the wrong chart, and as soon as the mistake was discovered defense counsel took immediate steps to rectify the situation. In a case involving such complex technical materials, it is easy to see how such a mix-up occurred. Because it is clear that the providing of the wrong chart was accidential, there is nothing in defense counsel’s conduct for the judge to comment on to the jury.
Upon discovery that a mistake had been made, the trial judge and attorneys for all parties involved held a conference outside the hearing of the jury. It was determined at this time that the best and fairest way of dealing with this situation was to allow defense counsel to explain and apologize for his mistake to the jury. There is no evidence that plaintiff was prejudiced in any way by this decision. It was within the trial judge’s much discretion to handle the matter in this manner.
These assignments of error are without merit.
ASSIGNMENT OF ERROR NO. 3
Frazee assigns as error the exclusion and inclusion of certain requested jury instructions. Frazee alleges that the trial court erred in giving G.S.U.’s requested jury instruction number 2 and in failing to give plaintiff’s requested jury instructions number 4, 8, 9, 18 and 21.
La.C.C.P. art. 1793(C) provides:
A party may not assign as error the giving or the failure to give an instruction unless he objects thereto before the *52 jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.
Plaintiff did not properly preserve any objections as to the jury instructions. Plaintiff’s counsel specifically stated “Your Honor, we don’t have any specific objections as to the charges which are — have been submitted by the Court; ...” It is clear that plaintiff did not object to the trial judge giving G.S.U.’s requested instruction number 2 at this time, accordingly this objection has been waived and plaintiff cannot now assign this as error. Furthermore, plaintiff’s counsel did not correctly object to the exclusion of plaintiff’s requested jury charges, failing to specifically state the grounds of his objection to the exclusion of these instructions.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 4
Frazee contends that the trial judge erred in allowing. G.S.U.’s witness, Mr. Otis McKnight, to give opinion testimony over objection when he was not tendered as an expert witness.
At the beginning of the original direct examination of McKnight, he was not tendered as an expert witness. (He was, however, tendered and accepted as an expert at a later point in the trial.) During this original direct examination, plaintiff objected to McKnight’s testimony twice, based on the grounds that he was going into opinion testimony. Both objections were overruled. In both cases the questions asked by counsel and responses given by McKnight were directed at clarifying McKnight’s answers to the same questions asked earlier on cross-examination. After a thorough review of the record we cannot say that the trial court erred in overruling the objections. In both instances McKnight was explaining and clarifying points that he had testified on earlier.
This assignment of error is without merit.
ASSIGNMENT OF ERROR NO. 5
Frazee contends that the jury committed manifest error in finding G.S.U. to be free from fault and liability for the accident. Frazee commences with and predicates his entire argument on the statement: “G.S.U. personnel read the meter at the construction site 2 or 3 days before the accident.” While it is true that G.S.U. specifically instructs its personnel, including meter readers, to observe and report any construction activity which potentially poses danger to persons at the site, it is not true that the meter was read 2 or 3 days before the accident. The parties stipulated that the meter was:
1. installed on August 9, 1978;
2. read on September 1, 1978;
3. read on October 3, 1978;
4. read on November 2, 1978; and
5. read on December 4, 1978.
The crane was delivered to the construction site on November 15, 1978 and the accident occurred on December 1, 1978. Thus, the meter was last read a month prior to the accident and two weeks before the crane was even on the property. The building under construction was 60 feet from the power lines and most of the construction materials for the building were located around and near the building. The crane was only moved into the position at the rear of the property and close to the wires shortly before the accident for the express purpose of lifting the bales of mesh. So even if the meter had been read two or three days prior to the accident, there would not have been any potentially dangerous activity going on at the time to alert the meter reader (and G.S.U.).
The transmission of electricity over isolated high tension power lines is not considered to be an ultrahazardous activity, therefore absolute liability is not imposed on utility companies. In the case of an electrocution the principles of negligence apply and the liability of the various parties to the accident should be assessed under a duty-risk analysis. Hebert v. Gulf States Utilities Company, 426 So.2d 111 (La.1983); Kent v. Gulf States Utilities *53 Company, 418 So.2d 493 (La.1982). It is well settled that Louisiana courts require a high duty of care by those dealing in the manufacture and distribution of electricity. Utility companies which maintain and employ high voltage power lines are required to exercise the utmost care to reduce hazards to life as far as practicable, and are required to protect against reasonably foreseeable situations. Wooten v. Louisiana Power & Light Company, 477 So.2d 1142 (La.App. 1st Cir.1985).
McKnight testified that the wires were insulated by isolation, that is, not by a covering but by the distance of the wire from anything, as defined by the National Electric Safety Code. Isolation in this sense means that the lines were not readily accessible to people because of their location. The wires were sixty feet from the construction site and there was 30' 4½" between the point of contact on the energized wire and the ground.
“Insulation by isolation is maintained until something intervenes. Just as time, climate, blows or other circumstances may deteriorate rubber insulation coating a wire, so insulation by isolation may deteriorate with a changing environment.” Herbert, supra at 116. In the instant case, after the construction of the power lines and with the advent of the construction of the office building, the potential existed for the deterioration of the insulation by isolation. No such deterioration or invasion of the insulation by isolation occurred until the actual accident, thus G.S.U. had no specific knowledge of the risk of harm attending work at this construction site. A utility company is not required to guard against situations which cannot reasonably be expected or contemplated. Simon v. Southwest La. Elec. Membership Corp., 390 So.2d 1265 (La.1980).
“In Simon and in Kent a majority of the Court found that the accident in each ease could not reasonably have been anticipated. It was not within the scope of the duty owed by the defendant utilities to the injured plaintiff because there was no ease of association between the risk presented by the utilities’ conduct under the overall circumstances and the resulting injuries.” Herbert, supra, at 114.
Both Simon and Kent involved workers on the ground who somehow came into contact with overhead power lines. One of the two Simon decedents was fatally shocked when a forty-two foot drilling pipe he was removing at ground level from a well hole touched an overhead power line 26.7 feet above the ground. The second decedent succumbed to shocks sustained in trying to rescue the first by picking up the drilling pipe with his hands. In Kent, the accident occurred when the thirty foot pole the victim was using in an unorthodox fashion [3] to texture the surface of a roadway came into contact with an overhead high voltage distribution line. The Court in Hebert, 426 So.2d at 115, stated: “Moreover, the risk is different for one assigned to work fifteen feet above the ground and atop a structure which is within ten or eleven feet of the power line, than for ground level workers who must use extraordinary means to contact the overhead electrical lines.” Thus a utility company would owe a different duty to a ground worker than to one who is working above the ground.
The instant case is similar to Kent in several respects: 1) the injured plaintiff was aware of the existence and location of *54 the overhead wires; 2) all of the workers and supervisors at the job site were cognizant of the wires; 3) a combination of unusual circumstances and factors led to the accident; and 4) the particular type of accident (electrocution) was not reasonably foreseeable with respect to the activity being engaged in (construction work at ground level).
There was evidence that the bales of wire mesh could have easily been moved manually to the second floor. All the evidence indicates that the idea to use the crane to transport the bales was a last minute one, and that had the crane not been on the premises the bales would have been moved by the workers manually. It was the combination of the facts that Fra-zee and the rest of his crew were through with the job for the day and that the crane was through with its intended use that led to the accident. If the crane and the work crew had not been through with their respective jobs at the same time, then the crane would not have been used to move the bales.
It is not reasonably foreseeable that the construction crew would use the crane to transport the bales which were located almost directly underneath the power lines. It is equally unforeseeable that the lifting operation would have been carried out in the manner in which it was — i.e., that the crane would be used to move the bales, that the crane operator would boom out fifty feet when he was within forty-five feet of the power lines, and that the men on the ground would guide the crane’s load line in as close as possible to the power lines. The bales could have, and should have, been pulled out from beneath the power lines (either by hand or by crane) prior to attempting to use the crane to lift the bales.
As stated before, G.S.U. had no notice that any potentially dangerous construction techniques were being employed. There is no evidence, or even any suggestion, of anyone involved with the construction project seeking G.S.U.’s advice or assistance in conjunction with working near the power lines. Although once the building construction began the potential existed that the insulation by isolation would deteriorate, none such deterioration or invasion of the insulation occurred until Frazee guided the load line into the power line. Thus the only notice that G.S.U. had of the potentially dangerous situation was the accident itself. G.S.U. knew nothing of what was happening and had no opportunity to intervene to protect Frazee. Factually, G.S.U. was not apprised of any happening involving its distribution lines until several months later.
Under the overall circumstances, it is difficult to conclude that G.S.U. acted unreasonably in failing to protect against these particular consequences. G.S.U.'s conduct at issue in this case is its decisions not to take additional precautions beyond the precaution of using circuit breakers and beyond the precaution of insulation by isolation, which was done in the original construction of the lines. We find that conduct not to be unreasonable. Furthermore, we find no ease of association between the risk presented by G.S.U.’s conduct under the overall circumstances and the injury which ultimately occurred. Kent, supra, at page 500; Hill v. Lundin and Associates, Inc., 260 La. 542, 256 So.2d 620 (1972).
The facts and evidence support the jury’s verdict that G.S.U. was free from fault. This assignment of error is without merit.
DECREE
For the foregoing reasons, the judgment of the trial court is affirmed. Appellant is cast for all costs.
AFFIRMED.

. There is some evidence that, upon "knocking off,” Frazee and the other ironworkers would have been through with this particular job.

. Plaintiffs assignments of error numbers 3, 4, and 5 have been reassigned numbers 5, 3, and 4 respectively for purposes of ease of discussion.

. Specifically, the Court found in Kent, supra at 499-500:
A combination of unusual factors concurred to cause this accident. The breaking down of the road machine caused the need to use the rake over an unusually long distance and period of time. The double width of the roadway caused the need to use an exceptionally long handle. The appropriation of the bench to another use caused the need to utilize the flip-flop method (which the Barber executives and others testified they had never seen used with such a long handle). The progress of the grooving to the point of intersection with the wires caused the need to devise an alternative method of procedure under the wires. Finally, Kent’s act of raising the handle into wires he had just been warned to avoid was necessary to complete the unfortunate scenario.