536 So.2d 798 (1988)
Holton Dale VINCENT and Claire Elizabeth Vincent, Plaintiffs-Appellants,
v.
BEAUREGARD ELECTRIC COOPERATIVE, INC., et al., Defendants-Appellees.
No. 87-1003.
Court of Appeal of Louisiana, Third Circuit.
December 20, 1988.
*799 Domengeaux & Wright, Richard C. Broussard, Broussard & David, Paul B. David/Hal J. Broussard, Lafayette, for plaintiffs-appellants.
Barnett, Pitre, Davis & Yoes, Earl G. Pitre, Lake Charles, for defendants-appellees.
Before GUIDRY, FORET and KNOLL, JJ.
KNOLL, Judge.
This is an electrocution case. Holton Dale Vincent (hereafter Holton), John Cooper Vincent (hereafter John), and Jean Eaglin (hereafter Jean) appeal an adverse jury verdict that found Beauregard Electric Cooperative, Inc. (hereafter Beauregard Electric) and its insurer, Federated Rural Electric Insurance Company, not liable for plaintiffs' injuries because Beauregard Electric was not negligent. The injuries plaintiffs received occurred when a grain auger, owned by Holton and being moved by Holton, John, and Jean, contacted a Beauregard Electric distribution line which traversed the eastern boundary of Holton's field.
Holton, John, and Jean, together with the wives of Holton and Jean, filed separate actions for their injuries, and their cases were ultimately consolidated in the trial court. The three cases are again consolidated on appeal, and we will render separate judgments in John Cooper Vincent v. Beauregard Electric Cooperative, Inc., 536 So.2d 805 (La.App. 3rd Cir.1988), and Jean Eaglin and Velma Eaglin v. Beauregard Electric Cooperative, Inc., 536 So.2d 806 (La.App. 3rd Cir.1988).
Plaintiffs contend that: (1) the jury verdict is clearly wrong; (2) the trial court erred in excluding plaintiffs' evidence pertaining to a settlement agreement entered into three years prior to this electrocution accident between Holton and Beauregard Electric which allowed Holton to keep the grain auger and bin located in proximity to Beauregard Electric's transmission lines; and, (3) the trial court erred in refusing plaintiffs' requests for a curative jury instruction because counsel for Beauregard Electric and Federated allegedly misstated the law on assumption of the risk in closing argument. We affirm.

FACTS
The facts of this case center on the location of a grain bin and the use of a grain *800 auger on Holton's property, and the geographical relationship of those farm implements to Beauregard Electric's transmission line located to the north of the grain bin, and its distribution line located to the east of the grain bin. As an aid to the understanding of the facts, the following engineering survey was introduced into evidence and is reproduced for reference:[1]
*801 
*802 The history and chronology of events surrounding the construction and location of the grain bin, and the various electric lines are also important.
In 1974 or 1975 Holton acquired the rural farm property located to the west of the road designated on the diagram; no improvements were yet situated on the land. Beauregard Electric had a three-phase electrical distribution line along the eastern boundary of the property, immediately adjacent to the road, which consisted of four uninsulated wires: three were charged with 7,620 volts of electricity, and the fourth wire was a static neutral. The static neutral line, suspended at a height of 27.58 feet above the ground, is the one that the plaintiffs contacted in 1983 with the auger.
At the time of Holton's acquisition of the property, CLECO had a transmission line, with a servitude of 50 feet on either side of the center line, that crossed Holton's property 83 feet north of the future site of the grain bin. This transmission line is not involved in the present litigation.
During the early part of 1976, Beauregard Electric hired Charlie R. McCain, a real estate appraiser, to acquire servitudes for a transmission line it wished to construct through Beauregard Parish. On May 14, 1976, Mr. McCain contacted Holton to obtain a 65 foot servitude to be located parallel to and south of the existing CLECO transmission line on Holton's property. Mr. McCain's attempts to negotiate a servitude agreement were not effective, and the matter was referred to Beauregard Electric's attorney for litigation.
In the summer of 1978, prior to the commencement of any expropriation proceedings, Holton constructed a Butler grain bin on his farm property, and located it within the proposed Beauregard Electric servitude. A sump pit, not altogether visible, was located east of the bin.
On April 10, 1980, Beauregard Electric commenced expropriation proceedings against Holton to take a 65 foot servitude across Holton's farm for a high voltage transmission line and to condemn the grain bin because its location and the operation of the grain auger near the proposed transmission line violated safety standards. However, on August 19, 1980, Holton and Beauregard Electric settled the expropriation suit before trial. Pursuant to the written settlement agreement, Beauregard Electric paid Holton $8,500 for the servitude, and he was allowed to keep his grain bin in the same location provided he would not interfere with the construction, operation, and maintenance of Beauregard Electric's transmission line. Holton also agreed to relocate his grain auger, essential to the operation of his grain bin, to the south side of the grain bin and restrict its use to that location. Since the northernmost edge of the grain bin was only 18 feet away from Beauregard Electric's transmission line, Holton further agreed to assume responsibility and liability for any injury or death caused by the auger coming into contact with Beauregard Electric's transmission line located to the north of the grain bin. The servitude agreement made no reference to the distribution lines already in place to the east of the grain bin.
On the morning of July 12, 1983, Holton, John, and Jean went to the grain bin to move the grain auger from the north side of the bin to the east side to unload wheat from the bin into a truck. The auger was located with its lower intake end beneath Beauregard Electric's transmission lines to the north of the bin, and the discharge end was located over the loading door at the top of the bin. The grain bin is 25 feet high, and necessitated that the grain auger be extended between 27.5 and 28 feet when it was over the bin's loading door located at the peak. Although the height of the grain auger was adjustable, the three men began moving the fully extended auger in a southeasterly direction so that the intake end could be placed in the sump pit located east of the bin. As the men swung the intake end around toward the south, causing the discharge end to swing toward the north, Holton stumbled and fell; the discharge end rose to an approximate height of 28 feet, swung further to the east, and its underside made contact with the outermost uninsulated distribution line at a *803 height of 27.58 feet. Holton, John, and Jean, who were all touching the auger, immediately received electric shocks.
As a result of the electric shock the men suffered severe injuries. Holton received third-degree burns to his right arm and hand and to his right thigh, and suffered scatter burn marks to his chest, left hand, head, and toes. The damage to his right hand necessitated its amputation just below the elbow. He was hospitalized twice for five different surgical procedures. John sustained third-degree burns to his upper arms, with scatter burn marks over his chest, left thigh, and calf. John sustained exit burns to his feet, ultimately necessitating amputation of a portion of his big toe. John underwent four operations. Jean sustained second-degree burns to areas of both arms, and exit burns through the big toe of each foot. He also sustained scatter burn marks over his chest and legs. Jean underwent three surgical procedures, and is in need of further surgery.
According to Beauregard Electric's engineering expert, Frederick Brooks, the distance from the base of the grain bin to the contacted distribution line (at a point projected at ground level) was 43.16 feet; the linear distance from the sump pit to the elevated point of contact on the distribution line was 51.25 feet, i.e., the length of the hypotenuse of the right triangle formed by the physical configuration consisting of the auger, the sump pit, and the distribution line. His final measurement revealed that the fully extended grain auger was 53 feet long.

LIABILITY
The plaintiffs first contend that the jury verdict, finding Beauregard Electric not liable for the electrocution injuries, was manifestly erroneous.
It is well settled that, absent a demonstration of clear or manifest error, an appellate court should not disturb the trial court's conclusions in factual matters. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
Electric companies who utilize and maintain high power lines are required to exercise the utmost care to reduce hazards to life as far as practicable. Nessmith v. Central La. Electric Co., 257 So.2d 744 (La.App. 3rd Cir.1972), writs denied, 261 La. 480, 483, 259 So.2d 921, 922 (1972). If it should be reasonably anticipated that persons may come into contact with electric lines, the operator of those lines is required to insulate them, or to take other proper and reasonable precautions to prevent injury. Id., at pages 748, 749. However, an electric company is not legally bound to safeguard against occurrences that cannot be reasonably expected or contemplated. Bordelon v. Continental Casualty Co., 229 So.2d 761 (La.App. 3rd Cir.1969), writ denied, 255 La. 483, 231 So.2d 396 (1970). Operators of power lines are not required to anticipate every possible accident which may occur and are not the insurers of safety of persons moving around power lines in the course of everyday living. Simon v. Southwest La. Elec. Membership, 390 So.2d 1265 (La.1980).
John and Jean, and to a certain extent Holton, contend that Beauregard Electric should have reasonably foreseen the accident because: (1) its expropriation action for its transmission line against Holton was necessitated because the location of the bin and the use of the auger was close to the power lines; (2) the resulting servitude agreement acknowledged the presence of the danger of electricity, and the use of the auger on the north and east sides necessitated the auger's use beneath either the distribution or transmission lines; and, (3) although the servitude agreement required the auger to be used on the south side of the bin, several of Beauregard Electric's employees saw the auger located in other locations near the grain bin.
In addition, Holton argues that when Beauregard Electric negotiated a settlement of the transmission servitude with him, it possessed specific knowledge of his use of the grain bin and auger near the distribution lines. He stresses that Beauregard Electric personnel, including surveyors, engineers, linemen, and legal representatives, *804 visited his bin site for the particular purpose of examining the grain bin for safety reasons. Accordingly, he contends that because of this detailed knowledge, Beauregard Electric should have reasonably foreseen this danger, and had a special duty to take additional steps to avoid the possibility of the auger contacting the distribution lines.
Beauregard Electric's argument is as follows: (1) Beauregard Electric had no knowledge of the location of the sump pit, and because of that, it did not know that the sump pit was located on the east side of the bin; (2) its employees never saw the auger in close proximity to the distribution lines, and there was no testimony that Beauregard Electric employees ever saw the auger in use on the east side of the bin between the bin and the distribution line that ultimately was contacted; (3) the distribution lines were clearly visible, and had existed for many years at this location prior to Holton's construction of the bin; (4) it complied with the electrical safety standards and isolated the distribution lines approximately 27 feet above the ground; and, (5) the auger was moved in a fully extended position, even though in that position the auger could not be used to load grain onto a truck.
We have carefully examined the record in this matter in light of the settled legal principles set forth above, and find no clear error in the jury's determination that Beauregard Electric was not negligent.
The record shows that Beauregard Electric's distribution lines comply with safety standards established by the National Electric Safety Code, and that they were located at the eastern edge of the property for many years prior to Holton's land acquisition, and his subsequent construction of the grain bin.
Furthermore, the testimony preponderates that the auger which Holton, John, and Jean were moving was in a position at the time of this accident which rendered its intended use either impossible or so ineffective that such use could not have been reasonably foreseen. In a fully extended position, the grain could not have been successfully deposited into the waiting truck without the grain scattering. In support of this determination the photograph taken just after the accident, Exhibit A-10, which depicts the unloading of the grain is telling because it highlights the much lower position of the auger needed to accomplish the task undertaken by Holton, John, and Jean. Under these circumstances, it cannot be said that the jury was manifestly erroneous in its conclusion that Beauregard Electric could not have reasonably foreseen that the grain auger would have been used in the fully extended position this close to the distribution line.
Moreover, like the facts of Simon, supra, where the electric company forewarned at least one participant in a water well drilling operation about the dangers of conducting activities near a clearly visible uninsulated electric line, it is equally evident that Beauregard Electric warned Holton about the dangers of using a grain auger in close proximity to electric lines through the expropriation proceeding, three years prior to the accident, and its continued utilization of customer literature, which in at least one instance particularly addressed the use of grain augers in close proximity to electric lines. Under the facts of this case it is of no moment that John and Jean were not parties to Beauregard Electric's settlement with Holton, regarding the location of its transmission lines three years prior to this accident or that this settlement was confected only between Beauregard Electric and Holton. Holton, John, and Jean testified that the distribution line which was ultimately contacted was clearly visible to them, and that they knew of the dangerous propensities of electricity. Although the jury heard conflicting evidence about whether the auger could be moved in a lowered position, the record amply supports that Holton, John, and Jean could have, nonetheless, lowered the auger before moving it. Likewise, it is inconsequential that the unloading of grain at a position east of the bin may have required the auger to be situated beneath the distribution lines. The record bears out that if the auger had been properly lowered, this unloading procedure, performed well beneath *805 the suspended distribution lines, could have been accomplished without the occurrence of this accident. In the final analysis, there is a preponderance of evidence that it was only the improper repositioning of the fully extended auger east of the bin that caused this unfortunate accident. Thus, we find that using the auger in this fully extended position, coupled with the Simon rationale applicable herein, takes this case out of the realm of a reasonably foreseeable accident.
Moreover, assuming for purposes of argument that Beauregard Electric could have reasonably foreseen the use of the auger in this manner, we also find that whatever duty Beauregard Electric may have owed to Holton, John, and Jean was fulfilled. In the present case, Holton, John, and Jean had complete knowledge of the dangers associated with the operation of equipment near electric lines. Furthermore, there was no testimony in the record which preponderated that Beauregard Electric had knowledge of the use of the auger on the eastern side of the grain bin, or that it knew the sump pit was located there. Accordingly, under the rationale of Simon, supra, and the circumstances of this case, it is clear that Beauregard Electric's warning to Holton not only fulfilled whatever duty Beauregard owed to him, but also that which it owed to John and Jean.
Because we have determined that the jury did not err in finding Beauregard Electric free from negligence, it is unnecessary for us to reach the evidentiary issue and the trial court's failure to give a curative jury instruction since our decision in those particulars would not adversely affect our affirmation of the first assignment of error.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of these proceedings are assessed equally to Holton Dale Vincent, John Vincent, and Jean Eaglin.
AFFIRMED.
NOTES
[1] We supplemented the diagram by more clearly identifying the transmission and distribution lines, and by inserting the distance from the easternmost edge of the grain bin to the Beauregard Electric distribution line which runs east of the bin. We have also referenced the diagram to indicate the location of north (at the top of the page).