474 So.2d 1352 (1985)
Wilbert Glenn EBEY, Jr., Plaintiff-Appellant,
v.
Michael F. COGGINS, & Commercial Union Insurance Co., Defendants-Appellees.
No. 17124-CA.
Court of Appeal of Louisiana, Second Circuit.
August 21, 1985.
*1353 Wright, Parker & Loftin by Lowen B. Loftin, Monroe, for plaintiff-appellant.
McCleod, Swearingen, Verlander & Dollar by Elmer G. Noah, II, Monroe, for defendants-appellees.
Before HALL, FRED W. JONES, Jr. and LINDSAY, JJ.
HALL, Chief Judge.
Plaintiff, Wilbert Glenn Ebey, Jr., brought suit against defendant, Michael F. Coggins, and the defendant's automobile insurer following a collision involving plaintiff's *1354 motorcycle and defendant's automobile. The accident, which occurred at the intersection of Riverside Drive and Forsythe Avenue in Monroe in the early morning hours of October 29, 1982, left plaintiff with multiple injuries including several fractures, abrasions, and contusions, as well as an acute lumbrosacral strain. Defendant and his passenger were uninjured.
At the conclusion of the trial, the district court found both plaintiff and defendant blameworthy in causing the accident. The court calculated plaintiff's damages at $89,029.43, but reduced this amount by 65%, the percentage of negligence attributed to plaintiff. On appeal, plaintiff challenges the apportionment of negligence, but not quantum. Since the defendant likewise does not appeal quantum, that portion of the judgment is not at issue. The single issue presented on appeal is whether the trial court was clearly wrong in assigning the greater percentage of negligence to the plaintiff. Because we find the court was clearly wrong in so apportioning fault, the judgment is reversed in part and amended in regard to the proper apportionment of negligence.
Riverside Drive is a two-lane street running generally north and south, bounded on the west by a levee. Forsythe Avenue is a boulevard running generally east and west with a tree-lined median separating the opposing traffic lanes. The intersection of the two streets approximates a right angle. Two or three hundred feet north of the intersection a road runs to the northwest from Riverside, over the levee, and into a recreational area where houseboats are docked.
Prior to the accident, defendant and a friend, Brian Dean, were travelling south on Riverside. They had just come from the recreational area where defendant's parents kept a houseboat. Earlier in the evening, they had drunk "a couple of beers" as evidenced by the fact that some 45 minutes after the accident defendant's blood alcohol level was measured at .05.
Plaintiff, who had been working late at his job in a body shop, was riding his motorcycle north on Riverside. His girlfriend was following in an automobile one or more blocks behind him. Because a light rain had just begun to fall, plaintiff was wearing goggles to shield his eyes. Plaintiff might have drunk a beer earlier in the evening. At trial, he initially testified that he had quit drinking altogether several months before and thus was sure that he had nothing to drink that day, but later amended his prior statements on his own, candidly admitting that, although he was not sure, he might have drunk a single beer at the body shop where he worked. Just as candidly, plaintiff admitted to being a marijuana smoker, and further admitted that he could have possibly smoked marijuana that day, although again he simply could not recall with any certainty. Other than plaintiff's admissions of what he might have done, there was no other direct evidence in the record of plaintiff's possible intoxication.
Plaintiff and defendant gave two highly conflicting versions of how the accident occurred. Plaintiff's version was partially corroborated by the testimony of Brian Washer who was riding a motorcycle south on Riverside behind defendant's vehicle, and who stated that he was an eyewitness to the accident. Defendant's version was partially corroborated by defendant's friend and passenger, although the passenger was looking out the side window of defendant's vehicle at the instant of the collision, and thus was not an eyewitness to the collision.
According to plaintiff, he was about six or seven car-lengths from the intersection when he first noticed defendant's vehicle. Plaintiff stated that he could not initially tell if defendant's vehicle was moving or not, but that soon afterward it began to make a left turn. Plaintiff testified that his own speed at the time was 25-35 miles per hour, and that as soon as he saw defendant's lights, he immediately tried to slow his motorcycle by braking, but upon doing so felt his rear wheel start to skid. Plaintiff then shifted to a lower gear to help slow his motorcycle, and began to move as far to the right-hand portion of his lane as possible without dragging against *1355 the curb, but nevertheless was struck by the left front portion of defendant's vehicle. Defendant's vehicle was said to have turned so far as to almost completely block plaintiff's lane.
Plaintiff's witness, Brian Washer, testified that he had just turned on to Riverside from the road to the recreational area when he saw defendant's vehicle ahead of him travelling south, and saw the headlight of plaintiff's motorcycle coming toward them. Washer corroborated plaintiff's version of the accident by stating that defendant had pulled out in front of plaintiff's motorcycle and had almost completed a left turn when the collision occurred. Washer's testimony also corroborated plaintiff's to the extent that plaintiff's headlight was on prior to the accident. Plaintiff had testified that he was sure his headlight, which was broken in the collision, was on prior to the accident because the light was wired to the motorcycle's ignition switch; if the motorcycle was running the light was burning.
According to defendant's version of the accident, just before the collision defendant had put on his blinker and was coming to a halt, preparing to turn left. Defendant estimated his speed at 3 to 5 miles per hour. Defendant saw two headlights coming toward him, and decided to wait to make his left turn until after the approaching vehicle had passed by him. Defendant initially admitted that his vehicle could have been partially in the northbound lane or on the line although he did not think that had been the case. His later statements in this regard were not significantly different. The import of his testimony was that he felt that he was on his side of the road, near or on the center line, and conceivably slightly in the northbound lane due a slight curve in the road. Defendant testified that he never saw the Ebey motorcycle, and was unaware of its presence until the instant of the collision. The impact was said to have spun the defendant's vehicle to the left approximately 90 degrees so that it faced east toward Forsythe Avenue. Defendant stated that after the collision his car rolled forward 3 to 5 feet toward Forsythe, but that the rear portion of his vehicle was still in the southbound lane after his vehicle came to rest.
Defendant's testimony was partially corroborated by his passenger, Brian Dean, who also testified that defendant's vehicle was moving very slowly prior to impact preparing to make a left turn. Because Dean was looking out of the passenger's window instead of straight ahead, he did not see the motorcycle. Nor could he testify as to the exact position of the vehicle in which he was riding at the point at which the collision occurred. He did testify that he was sure that he and defendant were not "in the middle of the turn", but really did not know if defendant's vehicle could already have been past the center line at the instant of impact.
Neither defendant nor Dean recalled seeing Brian Washer at the recreational area prior to leaving it and turning onto Riverside. Defendant testified that he was the first person to reach plaintiff after the accident, and that Brian Washer drove up several minutes later. Washer testified that he was at the recreational area prior to turning onto Riverside and witnessing the accident. He further testified that he reached plaintiff before defendant after the accident.
The police officer who investigated the accident testified that in his opinion, based upon the damage to the vehicles, the point of impact was in the northbound lane of Riverside. However, the officer apparently was mistaken as to the extent of the damage to defendant's vehicle, since the evidence revealed that the bumper of defendant's vehicle was removed prior to the night of the accident. Thus, the officer's estimate of the point of impact is somewhat suspect, and not entitled to the weight that it might otherwise have been given. The officer admitted that he was not sure of the exact point of impact, and that he was not helped in determining the point of impact by debris left on the street after the accident.
The trial court accorded no weight to the conclusions of the investigating officer as to the point of impact because the court *1356 considered the officer's conclusions not based upon "any specific known facts and not explained." The court also found the testimony of Brian Washer highly suspect "because of the testimony of Coggins and Dean and because he has apparently become quite friendly with plaintiff since the accident (he had been in plaintiff's company riding motorcycles in groups before the accident but `didn't really know him')." We note that the trial court apparently was mistaken in this regard since the record contained no references to Washer having been in plaintiff's company riding motorcycles in groups before the accident. All evidence in the record indicates that Washer and plaintiff, although each remembered having seen the other in bars prior to the accident, had never been introduced and had never spoken to each other prior to the night of the accident. Also, evidence in the record was quite meager with regard to the friendly relationship the trial court found had apparently developed between the two following the accident. In any event, the trial court, considering that it had few physical facts and totally conflicting testimony, found credibility to be a key issue.
The court found that the evidence, including damage to the vehicles, was consistent with the motorcycle striking the automobile in "something of a `corner,' side-swiping blow", and felt that the court's credibility findings supported this view. The court found that plaintiff had "a long history of quite irresponsible conduct, self-indulgence, and minimal restraint or discipline" and that to the extent the solution of the case depended upon the credibility of plaintiff's testimony, it was considerably less than convincing. The court found that the plaintiff was operating his motorcycle at an excessive speed in the rain on a slick street with his vision impaired through a rain spotted visor, that he was inattentive and made no real effort to avoid the accident, and that he drove his motorcycle somewhat head-long into the left corner of defendant's car. The court noted that plaintiff, by his own admission, relied upon his concept that he had the right of way even though he saw defendant's car at the intersection preparing to turn left at a time when the car was still a substantial distance ahead. The court also found that more probably than not, defendant was less than fully attentive, and that the left front corner of his car was somewhat over the center line and invading the northbound lane. The court concluded plaintiff's negligence contributed 65% to the accident while defendant's negligence accounted for the other 35%.
The provisions of LSA-R.S. 32:122 mandate that the driver of a vehicle within an intersection who intends to turn left shall yield the right of way to all vehicles approaching from the opposite direction which are either within the intersection or so close as to constitute an immediate hazard. Moreover, the courts of this state have held on many occasions that a left hand turn is one of the most dangerous maneuvers a motorist may execute, and that when making such a turn a motorist should execute great caution. See Freeman v. Liberty Mutual Ins. Co., 175 So.2d 659, 663 (La.App. 1st Cir.1965). Clearly, defendant in this case, who was preparing to make a left turn at the intersection, had a high duty to use great caution. This was particularly true since a light rain had just started to fall and the road was at its slickest, making it more difficult for other vehicles, especially motorcycles, to stop suddenly. The defendant never saw plaintiff's motorcycle. Plaintiff's testimony as to the particular manner in which his headlight was wired, and the testimony of Brian Washer that plaintiff's headlight was indeed burning, combined with the defendant's total lack of rebutting evidence indicate that more probably than not, plaintiff's motorcycle headlight was on prior to the collision. The trial court was not prepared to hold otherwise. Furthermore, both plaintiff and defendant agreed that defendant's vehicle's headlights were on prior to the accident. There was also testimony indicating that Riverside Drive is not unlighted, and it is doubtful that the light rain which had begun to fall had much of an obscuring effect on the visibility of defendant. The conclusion drawn from the preceding observations is that defendant *1357 failed to see what he should have seen in making his turn, breached the high duty of care placed upon him, and negligently crossed at least partially into the northbound lane. The particular type of harm that occurred in this case is very easily associated with a breach of the aforementioned duty. Put another way, the harm which occurred was a most foreseeable result of the duty breached, and defendant's negligence, much more than simply being a cause-in-fact, was a proximate and legal cause of the accident.
On the other hand, the evidence indicates that plaintiff was travelling in his proper lane. Again, the trial court was not prepared to hold otherwise. Because plaintiff was in his proper lane, he was justified in assuming that defendant would obey the law and not cut into the intersection. Thus, even though plaintiff saw defendant's vehicle at the intersection preparing to turn left when it was still a substantial distance ahead, plaintiff was not negligent in relying on "his concept that he had the right of way" since he did in fact have the right of way and was entitled to rely upon it. See Mayeux v. Maryland Casualty Co., 228 So.2d 234 (La.App. 1st Cir.1969). See also Willis v. Everett, 359 So.2d 1080 (La.App. 3d Cir.1978).
Appellate courts must give great weight to conclusions reached by the trial court, and where the testimony is conflicting, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed absent clear error. Moity v. Castille, 469 So.2d 503 (La.App. 3d Cir. 1985). In the absence of such clear error, an appellate court should adopt the trial court's findings as its own, even if other conclusions from the same evidence are equally reasonable. Perkins v. Certa, 469 So.2d 359 (La.App. 2d Cir.1985).
Even though we pay heed to the foregoing principles, we nevertheless cannot totally agree with the conclusions of the trial court in the present case. We do agree with the court to the extent that it found plaintiff's credibility weak and his version of the accident less than convincing. However, even accepting that the point of impact was not at the extreme right-hand edge of plaintiff's lane as alleged by plaintiff, or even that the impact did not occur after defendant had nearly completed his turn as alleged by Brian Washer, the abrupt spin of defendant's auto to the left following impact, combined both with the finding that the plaintiff was in his proper lane and the photographic evidence of the extent and location of the vehicular damage, indicates that defendant's invasion of plaintiff's lane was more a matter of feet than inches. The previously discussed breach of defendant's high duty of care along with the amount of defendant's encroachment into the lane in which plaintiff was travelling, are sufficient to establish, in the absence of a very high degree of negligence on the part of plaintiff, that the trial court was clearly wrong in attributing only 35% of the fault for this accident to defendant. For the reasons below, we find that plaintiff was negligent, but that his negligence was significantly less than the 65% assigned by the trial court.
The trial court recognized that plaintiff saw defendant's vehicle while it was still a substantial distance ahead. As noted previously, plaintiff was justified in relying on having the right of way, and thus in not taking action to avoid a possible accident at that point. To the extent that plaintiff may have then diverted his attention away from defendant until it was too late to avoid the accident, plaintiff may be found negligent. Plaintiff's own witness, Brian Washer, testified that he saw plaintiff take no evasive action prior to the collision. Similarly, plaintiff should be assessed some measure of fault if he were travelling at an excessive rate of speed prior to the accident as found by the trial court. However, it is difficult to find evidence in the record to support the trial court's conclusion. Damage done to the vehicles is not necessarily inconsistent with the speed of 25-35 miles per hour testified to by plaintiff. On the other hand, the trial court's conclusion is somewhat more understandable if simply meaning that plaintiff's speed was somewhat *1358 excessive given the slickness of the street due to the light rain falling.
The trial court's conclusion that plaintiff's vision was obscured by a rain-spotted visor is also difficult to understand. The only evidence presented on the issue of plaintiff's vision was the testimony of plaintiff himself who clearly denied any problem. Of course, to the extent it was raining, plaintiff's vision probably was less clear than it otherwise would have been. Nevertheless, accepting that plaintiff did see defendant a substantial distance ahead, and assuming that plaintiff diverted his attention elsewhere until it was too late, the issue of the extent of his vision impairment would seem inconsequential.
Giving the conclusions of the trial court as to plaintiff's negligence the greatest weight possible within the context of the preceding discussion, we hold that plaintiff's negligence cannot be viewed as being of the high degree necessary to place him more at fault than defendant. Thus, the trial court's assignment of percentages of fault must be reversed. As noted by the Louisiana Supreme Court in Watson v. State Farm, 469 So.2d 967 (La.1985), once an appellate court has determined that the trier of fact is clearly wrong, the appellate court is empowered by the provisions of LSA-C.C.P. Art. 2164 to "render any judgment which is just, legal, and proper upon the record on appeal." In Watson, the Court employed this power to shift the percentages of negligence of 100% for plaintiff and 0% for defendants as found by a jury to 20% for plaintiffs and 40% for each of two defendants. In the instant case, considering the totality of the evidence discussed above in regard to the negligence of the parties, we find defendant should be assessed with 65% of the fault for the accident, and that plaintiff should be assessed with the remaining 35%. Plaintiff's damages should be reduced accordingly.
In accordance with the reasons set forth above, the judgment of the trial court is reversed in part and amended as to the percentages of negligence of the parties. Plaintiff's negligence is fixed at 35% and defendant's at 65%, plaintiff's damages of $89,029.43 are reduced by 35%, and the principal amount of the judgment in favor of plaintiff against defendants shall be the sum of $57,869.13. As so amended, the judgment is affirmed. Costs of the appeal are assessed to the defendants.
REVERSED IN PART, AMENDED, AND AS AMENDED, AFFIRMED.