524 So.2d 35 (1988)
Alma Martin DIXON, Individually and as a Natural Tutrix of the Estate of the Minor Child, Shannon Larae Dixon, Plaintiff-Appellant,
v.
NORTHEAST LOUISIANA POWER COOPERATIVE, INC., Defendant-Appellee. Peggy Parker KENNEY, Plaintiff-Appellant,
v.
NORTHEAST LOUISIANA POWER COOPERATIVE, INC., Defendant-Appellee.
Nos. 19432-CA, 19433-CA.
Court of Appeal of Louisiana, Second Circuit.
March 30, 1988.
Writ Denied June 3, 1988.
*36 Davis, Saunders & Richard by Benjamin B. Saunders, C. Perrin Rome III, James T. Davis, Metairie, and Samuel T. Singer, Winnsboro, for plaintiffs-appellants.
Theus, Grisham, Davis & Leigh by Ronald L. Davis, Jr., Monroe, and William R. Coenen, Rayville, for defendant-appellee.
Before MARVIN, FRED W. JONES, Jr. and LINDSAY, JJ.
LINDSAY, Judge.
These consolidated wrongful death suits arise out of the accidental electrocution deaths of the plaintiffs' husbands. The plaintiffs are Alma Martin Dixon, the widow of Freddie Dixon, who sues individually and as tutrix of her minor child, Shannon LaRae Dixon; and Peggy Parker Kenney, the widow of David Kenney. Named as defendant is the Northeast Louisiana Power Cooperative, Inc. ("Northeast"). The plaintiffs appealed the judgment of the trial court rejecting their claims for damages. For the following reasons, we affirm the judgment of the trial court.

FACTS
Freddie and Alma Dixon lived in a mobile home on Cruse's Dairy in rural Franklin Parish. They moved there in about May, 1981. The mobile home is located near the defendant's power lines. The following schematic diagram shows the relative locations of the mobile home and the defendant's power lines.
*37 
On the afternoon of November 6, 1981, the Dixons and their friends, Peggy and David Kenney, were at the Dixons' residence. At between 5:00 and 5:30, the men went outside. Subsequent noises attracted the attention of the women, and they went outside to investigate. The women saw Mr. Dixon driving a pipe into the ground between the tongue of the trailer and its front wall, and Mr. Kenney hooking up a coax wire to the end of a CB antenna. The CB antenna had been placed so that the top of the antenna was pointing in a generally easterly direction beneath the power lines, and was lying across a wooden fence under the power lines. The women testified that the CB antenna had not been outside earlier, and that the men must have obtained it from another house at the dairy.
The women went back inside the trailer to begin cooking supper. Shortly thereafter, at about 6:15 p.m., they heard a loud "popping" noise. The trailer lights flickered, and the light over the stove went out. When the women went outside to see what had happened, they discovered Mr. Kenney lying dead near the wooden fence. Mr. Dixon was lying on the ground, still alive. However, he quickly expired despite attempts to revive him with artificial respiration.
Apparently the men raised the CB antenna into the nearby uninsulated power lines, resulting in their electrocutions. The defendant's power lines consisted of two phase lines, each carrying 8,000 volts to the ground (13,800 volts, phase to phase). A *38 neutral wire ran between them. The lines ran in a north-south direction, with the trailer running in an east-west direction, west of the power lines. The tongue of the trailer was located on the east end of the trailer, near the power lines.
The evidence demonstrated that the road phase line, or the phase line farthest from the trailer and closest to the road, was 28 feet 10 inches above the ground. The field phase line, or the phase line closest to the trailer, was 28 feet above the ground. The CB antenna was 32 feet, 6 inches in height. The phase lines were about three and a half feet apart. The top of the Dixon's trailer was 10 feet 2 inches in height.
The record reveals that the trailer was approximately four and three-fourths feet from a vertical extension of the field phase line. The end of the trailer tongue was about one and a half feet from the vertical extension of the field phase line. Burn marks on the road phase line indicate that this is the phase line with which the CB antenna came in contact. Burn marks indicating contact with the wire were located 2 feet 8 inches from the top of the antenna.
On November 5, 1982, the widows of the decedents each filed suit against Northeast. Mrs. Dixon also sued in her capacity as tutrix of the minor child born of her marriage with the decedent. On January 30, 1986, the cases were consolidated for trial. Trial was held on March 13 and 14, 1986. The trial court rendered its written reasons for judgment on October 3, 1986, rejecting the demands of the plaintiffs. The trial court found that Northeast had not violated the National Electric Safety Code and that Northeast was not liable for the deaths of the decedents. A judgment in compliance with the trial court's written reasons was signed on April 20, 1987, and filed on May 8, 1987.
The plaintiffs appealed devolutively. They rely upon the following assignments of error: (1) the trial court erred in finding that the defendant did not violate the National Electric Safety Code; (2) the trial court erred in finding that the defendant did not breach its duty of care owed/duty to warn the decedents of the hazards of uninsulated overhead wires; and (3) the trial court erred in finding that the defendant was not strictly liable under LSA-C.C. Arts. 2315 or 2317, or absolutely liable as an enterpriser engaged in an ultra-hazardous activity.

CODE VIOLATIONS
The plaintiffs assert in their first assignment of error that the trial court was manifestly erroneous in its determination that Northeast did not violate the National Electrical Safety Code (NESC). If a violation of the NESC is shown, this would amount to negligence per se on the part of the defendant.
James A. Taylor testified as an expert witness for the plaintiffs as to poles, lines, and clearances. He testified that Northeast violated several provisions of the NESC. Prominent among the alleged violations were the location of the field phase line over the tongue of the trailer, the lack of compliance with the applicable horizontal clearances, and the absence of guy guards on guy wires.
As a factual matter, the plaintiffs argue that the tongue of the trailer was directly under the field phase line. There was conflicting testimony from the various witnesses as to the exact distances between the trailer and the lines, and the point from which the measurements were taken (from the front wall of the trailer or the tongue of the trailer to the phase line.) After weighing the testimony, the trial court found, as stated in its written opinion, that the front wall of the trailer itself was four and three fourths feet from a vertical extension of the field phase and the tip of the trailer tongue was about one and a half feet from that same vertical extension. In so finding, the trial court relied upon an accident area profile and topographical survey which was compiled in April, 1982, and which was introduced into evidence during the trial.
Conclusions reached by the trial court are entitled to great weight by appellate courts. Where the testimony is conflicting, reasonable evaluations of credibility *39 and reasonable inferences of fact should not be disturbed absent clear error. In the absence of such clear error, an appellate court should adopt the trial court's findings as its own, even if other conclusions from the same evidence are equally reasonable. Ebey v. Coggins, 474 So.2d 1352 (La.App. 2d Cir.1985). We find no such clear error, and thus adopt the trial court's factual determination as to the distances referred to above.
Hugh P. Balfour, a retired division engineer of the Louisiana Power and Light Company, testified on behalf of the defendant as an expert in electrical engineering with expertise in design and installation of electrical distribution systems. He testified that, according to his interpretation of the NESC, no violations had taken place.
The expert witnesses for the plaintiffs and the defendant differed in several aspects in their interpretations of the NESC. Mr. Taylor interpreted the NESC as inflexibly mandating both horizontal and vertical clearances at all times. He was unable to satisfactorily explain the Code's inclusion of diagonal clearances. On the other hand, Mr. Balfour testified that compliance with the NESC may be achieved when there is adequate vertical clearance alone. He further explained that the Code provides for the application of diagonal clearances in some cases.
The question of assessment of the credibility of comparing expert witnesses is best left to the trier of fact who has the opportunity to observe the respective demeanor of the witnesses. Oswald v. Rapides Iberia Management Enterprises, Inc., 452 So.2d 1258 (La.App. 2d Cir.1984), writ denied 457 So.2d 14 (La.1984). The trial judge's determination of the most credible expert witness and testimony will not be disturbed unless clearly erroneous. Miller v. Harvey, 408 So.2d 946 (La.App. 2d Cir. 1981).
Under the circumstances of this case, we are unable to find that the trial court was manifestly erroneous in its holding that there were no violations of the NESC. The Code is obviously open to interpretation. Both the plaintiffs and the defendant presented experienced and able expert witnesses to give the trial court the benefit of their expertise in interpreting the NESC. Given the total incompatibility of their respective interpretations and the apparent reasonableness of each view, we cannot say that the trial court erred in choosing one over the other.
Accepting Mr. Balfour's interpretation of the NESC, we find that the defendant did not violate its provisions. Mr. Balfour testified that the NESC does not require both minimum horizontal and vertical clearances, provided there is adequate vertical or diagonal clearance from a building to the conductors.
Section 234(A)(3) provides that "the horizontal clearance governs above the roof level ... to the point where the diagonal equals the vertical clearance requirement...." If the conductor is located higher than the minimum vertical clearance, measured either diagonally or vertically from the roof of the structure to the conductor, the horizontal clearance becomes inapplicable and unnecessary. The NESC apparently does not prohibit the running of conductors directly above a building or structure (where there is obviously no horizontal clearance) provided the vertical clearance specified by the NESC is met. This is further demonstrated by Table 234-1 which provides for vertical clearances "above ... balconies and roofs accessible to pedestrians," apparently negating the contention of plaintiffs' expert that horizontal clearances must always be maintained. Also apparently negating Mr. Taylor's contention is Section 234(C)(2), which provides that wires may be run over buildings provided the proper clearance specified in Table 234.1 is maintained.
Reading Section 234(A)(3) in conjunction with Table 234-1, the amount of clearance required between the roof of the trailer and the conductors in the instant case can be determined. Table 234-1 provides that the vertical clearance "above ... roofs ... not accessible to pedestrians" must be a distance of ten feet, measured vertically or diagonally from the roof to the conductor. Although Table 234-1 also refers to horizontal *40 clearances, those clearances do not control "above the roof level ... where the diagonal equals the vertical clearance requirement." See Section 234(A)(3).
In the instant case, the evidence reveals that the distance from the ground to the phase lines was at least 28 feet, thus exceeding the required minimum 20-foot vertical clearance for an area such as the one in which the Dixon trailer was located. See Table 232-1. Further, the distance from the roof of the trailer to the conductor, measured both vertically and diagonally, exceeded the 10-foot clearance required by the Code by at least 8 feet.
Inasmuch as the vertical clearance of the phase lines exceeded the NESC minimum requirement, and horizontal clearances are not always applicable, the defendant did not violate the Code.
This assignment of error has no merit.

NEGLIGENCE
In their second assignment of error, the plaintiffs contend that the trial court erred in finding that Northeast did not breach its duty of care or its duty to warn the decedents of the hazards of the uninsulated overhead wires. They argue that it was foreseeable that the decedents would erect a CB antenna that would become entangled in the wires. The plaintiffs maintain that Northeast should have warned the Dixons that they were dangerously close to the overhead wires.
The trial court applied the duty/risk analysis and held that Northeast had no reason to anticipate the decedents' activities in raising a CB antenna. Consequently, Northeast violated no duty to protect the decedents against the injury.
John C. Tucker, Northeast's local manager, testified that these high voltage wires are "insulated by isolation." This means that they were not wrapped with insulating material because they were considered insulated by their distance from the ground. The wires were not otherwise insulated because it was not economically feasible. The defendant is a locally owned, non-profit enterprise organized by the people in that rural area. Mr. Tucker stated that if all the wires were required to be insulated, these rural people would be unable to afford electricity. Additionally, Mr. Tucker testified that ultraviolet rays would eventually destroy the insulating materials.
The plaintiffs rely heavily upon Meche v. Gulf States Utilities Company, 436 So.2d 538 (La.1983). In that case, recovery was allowed for the electrocution death of a man who was erecting a TV antenna after dark in a trailer park. We find that the plaintiffs' reliance is unwarranted as the instant case is factually distinguishable from Meche, supra. In Meche, the accident occurred during the decedent's first visit to the trailer park. His daughter's mobile home had been moved to the site the day before. The decedent arrived at the trailer park in the late afternoon. He and other family members used their car headlights to illuminate the area in which they were working.
The court in Meche stated that:
Here, there was no reason for the men to anticipate the existence of an uninsulated high voltage line within reach of a normal television antenna in the middle of a mobile home park.... The men in this case raised the antenna into an electric wire which they did not know was there, could not see, and had no cause to anticipate....
In the present case, the decedents did not have a comparable lack of knowledge of the existence of the overhead wires. Mr. Dixon had lived at the site of the accident for about five months prior to his death. There is no evidence indicating that Mr. Kenney had never been to the Dixons' trailer home prior to the date of the accident. To the contrary, Mrs. Kenney testified that she and her husband had been to the Dixons' residence numerous times before the accident and that they "knew the dairy pretty well."
Additionally, Mrs. Kenney testified that it was still daylight when the men initially went outside. When she and Mrs. Dixon first went outdoors and found their husbands working with the CB antenna, it was *41 "dusk dark." However, there was no lack of visibility.
In Meche, supra, the court also considered the occurrence of the accident in a trailer park to be highly relevant. It found that extra precautions were mandated by the close proximity of mobile homes with each other in a trailer park. The court found that where high voltage lines were run through the interior of a trailer park, the utility company should have reasonably anticipated that there might be difficulties in the erection of television antennas.
In the present case, no such considerations are applicable. The Dixon trailer was not located in such a confined area. The Dixons had previously erected a TV antenna without incident.
Testimony was given that CB antennas had been a fad of the 1970's, the popularity of which had greatly waned by the time of the accident in 1981. Employees of Northeast drove by the Dixons' trailer several times a week. None of the linemen ever saw anything which would have indicated that the Dixons were considering installation of a CB antenna on their property. The CB antenna had apparently been located somewhere else on the dairy immediately prior to the accident. The defendant utility company had no reason to anticipate that a CB antenna was to be installed at the Dixon trailer.
Electric transmission companies which maintain and employ high power lines are required to exercise the utmost care to reduce hazards to life as far as practical. If it should be reasonably anticipated that persons may come into contact with electric lines, the operator of those lines is required to insulate them, or to give adequate warning of the danger, or to take other proper and reasonable precautions to prevent injury. Simon v. Southwest Louisiana Electric Membership Corporation, 390 So.2d 1265 (La.1980). However, an electric utility is not required to guard against situations which cannot reasonably be expected or contemplated. Hebert v. Gulf States Utilities, 426 So.2d 111 (La. 1983).
The defendant adequately insulated the wires by isolation, maintaining them at a height that exceeded the NESC requirements. There was no deterioration or invasion of the insulation by isolation prior to the accident to alert the defendant to a risk of harm. Under the facts of this case, Northeast was entitled to rely upon the warning of danger implicit in the mere presence of the electric wires in plain view. In this respect, the present case again differs from Meche. The decedent in that case, having no familiarity with his surroundings and no reason to know of the wires' presence, was not effectively warned. The same cannot be said of the decedents in this case.
There has been no showing that the defendant acted in a negligent manner, resulting in this accident. This assignment of error is without merit.

STRICT/ABSOLUTE LIABILITY
In their last assignment of error, the plaintiffs argue that the trial court erred in not applying either strict or absolute liability against Northeast. We find this assignment to be without merit.
In the case of an electrocution, the principles of negligence are applicable and the liability of the various parties should be assessed under a duty/risk analysis. Because the utility had actual knowledge of the condition of its lines, i.e., that the lines were not covered with insulating materials and that they were located at a certain height at a certain location, it is unnecessary to impute such knowledge to the defendant through the principle of strict liability. Kent v. Gulf State Utilities Company, 418 So.2d 493 (La.1982); Hebert, supra; Horton v. Valley Electric Membership Corporation, 461 So.2d 375 (La.App. 2d Cir.1984). Consequently, the trial court did not err in refusing to apply the principles of strict liability in the case before us.
Nor did the trial court err in refusing to apply absolute liability to this case. The transmission of electricity over isolated high tension power lines is not considered to be an ultra hazardous activity. *42 Therefore, absolute liability for injury or death is not imposed upon utility companies. Kent, supra; Hebert, supra; Frazee v. Gulf States Utilities Company, 498 So. 2d 47 (La.App. 1st Cir.1986), writ denied 501 So.2d 215 (La.1987).

CONCLUSION
For the foregoing reasons, we affirm the judgment of the trial court. Costs are assessed against the plaintiffs-appellants.
AFFIRMED.