560 So.2d 38 (1990)
Alice Bell McCRARY, et al., Appellants,
v.
PARK SOUTH PROPERTIES, et al., Appellees.
No. 21385-CA.
Court of Appeal of Louisiana, Second Circuit.
April 4, 1990.
Writ Denied June 1, 1990.
*40 Beard & Sutherland by Roy L. Beard, for appellants.
Wiener, Weiss, Madison & Howell by James Fleet Howell, for appellees.
Before FRED W. JONES, Jr., LINDSAY and HIGHTOWER, JJ.
FRED W. JONES, Jr., Judge.
From a judgment rejecting their demands to cancel a ground lease covering approximately 31.5 acres in south Shreveport, plaintiffs appealed, contending the trial court committed the following errors:
1) In failing to find that the lessees were in default for violation of the terms of the ground lease where the ground sublease between the lessees and a third-party allowed the subtenant to construct, own and have title to the buildings placed on the leased premises, not cured by the lessees after notice and demand.
2) In holding that lessees complied with the insurance requirements for liability insurance and insurance on improvements.
3) In holding that the lessees complied with the obligation of the ground lease to provide the required certified statement of rentals, receipts and other income.
4) In holding that no development of the leased premises by the lessees was required.
5) In failing to consider all the provisions of the lease agreement in toto and *41 in basing its decision on one sub-paragraph of the ground lease.
6) In holding that the lease was suspended and extended and that the lessees were not required to pay rent or ad valorem taxes as required by the lease and that the lessees could collect and retain rentals and taxes from the subtenants without any payments to the lessors.
7) In accepting F. Truly as an expert witness in the area of commercial development of property.
8) In finding that the notice of default sent by the lessors to the lessees constituted a cloud on the lessees' leasehold title thus preventing lessees from properly developing the leased premises.
9) In failing to cancel the ground lease and in failing to award liquidated damages to the lessors.
Factual Context
This litigation arose from a ground lease of property consisting of approximately 31.5 acres located on Mansfield Road immediately adjacent to South Park Mall. In 1971 F.H. Delaney evidenced an interest in the large tract of property which belonged to the estate of J. Hoyte McCrary. McCrary's widow, Alice Bell McCrary, was testamentary executrix of the estate.
After the initial contact Delaney received a call inquiring as to whether or not he had an interest in the property and the parties began to negotiate. After extensive negotiations, the parties agreed on an option for a long-term ground lease of the property which would allow for commercial development of the property as a regional shopping center. At this time Shreveport did not have an enclosed mall and it was felt this concept would be an area for growth in the future. Mrs. McCrary, as family spokesman, sought a long-term ground lease which would provide her family with a stream of income, rather than a large sum of money from the sale of the property, and also protection against inflation by percentage rentals during the lease period.
On March 8, 1972 the parties entered into a two year option to lease the property. The parties extended the option on February 18, 1974 for an additional year. Less than two months after executing the option, Delaney publicly announced the proposed construction of The New-South Mall, a regional shopping center to be developed and located on the McCrary property. Delaney negotiated with large department stores for anchor positions in the project but Delaney's plans for an enclosed mall were thwarted by the development of South Park Mall.
In August, 1973 Delaney formed Southside Centers Associates, a partnership between himself as managing partner of D & W Properties, McMichael Construction Company and Evans & Evans Architects. The purpose of the partnership was to construct a regional commercial mall on the McCrary property. On October 4, 1974 Delaney, on behalf of D & W Properties, executed an agreement to lease a portion of the McCrary property to First National Bank of Shreveport. On October 17, 1974 McMichael Construction Company withdrew from the partnership without having any knowledge of this agreement. Upon learning of the proposed sublease, McMichael Construction filed suit and was eventually restored to its partnership interest. See W.A. McMichael Construction Company v. D & W Properties, 356 So.2d 1115 (La.App. 2d Cir.1978), writ denied, 359 So.2d 198 (La.1978).
Despite the construction of South Park Mall, on December 30, 1974 the parties elected to enter into a long-term net ground lease by which lessees assumed all responsibilities of ownership, the initial term of which was to be for 50 years commencing on January 1, 1975. The ground lease contract also granted defendants three options to extend the ground lease for three additional ten year periods which, if exercised, would extend the lease for an 80 year period. The lease provided for the payment of graduated base rent beginning at $18,000 for the first lease year and up to $40,000 for the ninth and each succeeding lease year. The lease further provided for the payment of percentage rentals triggered when the lessees' gross adjusted receipts for each year exceeded $3.25 per gross *42 square foot of improvements upon the premises.
After the opening of South Park Mall, the lessees decided to first develop the out-parcel tracts on the property and to delay developing the remainder of the tract until the adjacent mall had fully matured and become fully leased, a period estimated to be approximately five years. While waiting for the mall to mature, the lessees negotiated and entered into a commercial sublease contract for an out-parcel development with First National Bank for the construction and operation of a branch banking facility. The banking facility was considered to be a good method to attract traffic and ultimately draw other business to the property. The ground sublease was executed on April 7, 1975 and the lessors agreed to join themselves as a special lessor party in the contract to acknowledge the special provisions and agreements of the sublease. In November, 1979 the lessees negotiated and entered into a similar commercial sublease contract with Midas Realty Corporation for the construction and operation of a Midas automotive maintenance service and repair facility as another out-parcel development. Lessees completed the sublease agreement with Midas Realty Corporation without requesting or requiring lessors to consent to the sublease. The Midas sublease specifically contained a reference to the ground lease executed between plaintiffs and defendants. The lessors then took the position that the sublease to Midas was not a proper commercial development of the leasehold premises.
On August 10, 1981 lessors sent a default letter to lessees by certified mail asserting that lessees had breached and violated the ground lease contract and that lessors, not the lessees, had contractual authority and discretion under the ground lease to make the determination as to how and when the property would be developed. Lessors stated it was their opinion that the construction and location of the Midas Muffler Shop facility at its present site would not be in the furtherance of development of a regional commercial center in accordance with the objectives and purposes of the ground lease.
On July 6, 1983 plaintiffs instituted this action for cancellation of the ground lease and for liquidated damages. Plaintiffs alleged they were entitled to cancellation of the lease agreement and liquidated damages because defendants had failed and refused to develop the leased property in accordance with the terms of the lease that the property be developed as a regional commercial center. Plaintiffs contended that the failure by defendants to develop the property had resulted in a loss to plaintiffs of percentage rentals provided by the lease agreement. Plaintiffs asserted that since the commencement of the lease, lessees had only entered into two agreements for development of the property and the agreement with Midas was in violation with the lease agreement. Plaintiffs notified defendants on August 10, 1981 that they were in violation of the lease by virtue of the Midas agreement and the breach of the leases should be cured forthwith. However, defendants failed to cure the lease violation. Plaintiffs also alleged defendants had failed to provide them with a copy of insurance on the improvements occupied by Midas in compliance with the lease and had also failed to provide a certified statement of rentals for 1981 and 1982 as required by the lease. Plaintiffs alleged defendants had tacitly, if not expressly, declared their unwillingness to cure the default, violation and breach of the lease agreement and had taken the position they would not develop the property in accordance with the terms of the lease. Plaintiffs further alleged that Howard R. Crumley, F.H. Delaney, Norman Kinsey and Edwin Whited had signed a guaranty agreement to lessors individually and in solido for payment to lessors of liquidated damages provided for in the ground lease. Therefore, plaintiffs sought judgment against these defendants for the amount of the stipulated liquidated damages.
In response, defendants filed a reconventional demand contending that while acting in their discretion pursuant to the terms of the lease, they had negotiated and entered into commercial subleases with First National *43 Bank and Midas Realty Corporation. Defendants contended that after the perfection of the sublease agreement with Midas, plaintiffs took the wholly arbitrary and capricious position that the sublease was not proper commercial development of the leasehold premises. Defendants asserted that the default letter constituted an improper slander of defendants' legal leasehold title to the premises and expressly violated defendants' rights to commercially develop the property. Moreover, the letter constituted a legal obstacle which had wrongfully prevented defendants from commercially developing the property. As a result of this alleged wrongful slander, defendants alleged they had lost the benefit of thousands of dollars paid to plaintiffs in ground rent and that defendants had lost substantial income they could have derived from numerous other commercial developments on the property had plaintiffs not wrongfully slandered their legal leasehold title. Defendants argued that in light of their legal and contractual rights under the lease, the surrounding commercial developments in the area and the then existing economic conditions, they had at all times acted as prudent businessmen and developers. Defendants asserted they were entitled to recover compensatory damages from plaintiffs and to have the initial term of the original ground lease suspended and extended by a period of time equal to and commensurate with the period beginning August 10, 1981, when plaintiffs initially slandered defendants' legal leasehold title, and ending when the legal proceeding was finally adjudicated.
Plaintiffs later filed an amended and supplemental petition stating they were entitled to an accounting from defendants of all receipts, rentals, credit and any other consideration received by defendants in connection with the lease from the date of inception of the lease until the date of the accounting and plaintiffs were entitled to a judgment against defendants in the amount of these receipts, rentals and credits from the date of the filing of the action until present. In the event the court found the lease agreement had not been terminated, plaintiffs also asserted they were entitled to a judgment against defendants for accrued monthly rentals and ad valorem property taxes. Plaintiffs alleged they had paid ad valorem property taxes on the leased premises for the years 1983-1986 and they had not accepted the monthly rentals due from August, 1983 to present.
Trial Court Action
After a lengthy trial on the merits, the trial court handed down an extensive written opinion. After examining the provisions of the ground lease and the pertinent testimony, the court essentially found that defendants were contractually and expressly granted the right, obligation and discretion of ownership of the leasehold premises including the right to develop the property at such time and in such manner as defendants determined in their discretion. The court noted the parties committed their agreement to writing after exhaustive and extensive negotiations which indicated they must have intended to include all of the lease agreement in writing. Moreover, the ground lease agreement recited it contained the full and entire agreement of the parties. The court found that if the parties intended to guarantee the immediate development of the premises and immediate production of percentage rentals, these terms would have been specifically included in the written agreement. There were no provisions in the original ground lease agreement that addressed a deadline by which defendants had to construct any specific buildings on the premises or any provisions that would guarantee a time percentage rentals would come into reality. The court found it could not ignore the clear and express terms of the written ground lease particularly when the lease was a bargained-for contract negotiated by highly skilled representatives who were well versed in the nuances of the commercial real estate market. The court was persuaded the parties intended for defendants to have substantial flexibility in the use of the property in exchange for the security of the rental provisions that plaintiffs skillfully negotiated. Thus, plaintiffs were not entitled to cancellation and termination of the original ground lease for the alleged *44 failure of defendants to properly develop a regional commercial center.
With reference to plaintiffs' argument that defendants had utilized the subject leasehold property contrary to and inconsistent with the purposes of the original lease, the court found the sublease with Midas was not in violation of the concept of a regional commercial center but rather was a proper out-parcel use of the leased premises and in furtherance of the development of a regional commercial center. The court found the original ground lease clearly and expressly granted to defendants full authority and complete discretion to develop the premises in the manner defendants determined to be the most prudent for the benefit of all parties and plaintiffs knowingly and intentionally granted defendants the right to commercially develop the property as fully as though the owner. The court found that once defendants lost out in the competition to be the developers of an enclosed mall, the lease gave defendants the right to exercise such other commercial options as were reasonably available and plaintiffs were still protected by the base rental provisions.
The court further found that the record showed defendants had fully complied with the insurance requirements. Defendants had maintained insurance of "all risk" limits of not less than $1,000,000 covering the leasehold property in accordance with the original ground lease and defendants introduced certified copies of liability policies of insurance for Park South Properties, Midas and First National Bank which established that the subject property and improvements thereon were properly insured from January 1, 1975 through the time of trial. The court also found that defendants submitted a list of annual income for the years 1981 through 1984. Plaintiffs had copies of the subleases with First National Bank and Midas and thus had full knowledge as to the actual rentals received by defendants.
With reference to defendants' reconventional demand, the court found they were entitled to have the initial term of the original ground lease suspended and extended by a period of time equal to and commensurate with the period beginning August 10, 1981 when plaintiffs slandered defendants' title to the property and ending when this proceeding was finally adjudicated. The court reasoned that as a result of the unfounded default letter, defendants were unable to obtain further title insurance policies and were thus prevented from developing the premises.
The court issued a supplemental opinion responding to plaintiffs' contention that the court did not explicitly resolve their claim that defendants owed them an accounting and payment of rentals, receipts and credits received by defendants from the sublessees during the time the lease was suspended. The court noted that under the terms of the lease, defendants were obligated to pay base rent to plaintiffs for the term of the lease unless the property was further developed, thus triggering the percentage rental provisions. Until the percentage rental provisions were triggered, the source of the payment of the rentals was not contingent on the amount of rentals received from any subtenants. The court found that the most plaintiffs could receive under the lease absent the percentage rental provisions being triggered was base rent for 50 years and plaintiffs would receive their full 50 years of rentals even though the receipt of those monies would be delayed by the period of time in which the ground lease was suspended. The court noted that plaintiffs were in essence asking to receive rentals from the third-party tenants which they otherwise would not have received had the lease not been suspended. Defendants had not received a windfall with respect to these rentals because that money will be paid to plaintiffs directly or indirectly during the full course of the lease.
Legal Principles
It is well-settled that appellate courts may not disturb the fact findings of the trial court in the absence of manifest error. Conclusions reached by the trial court are entitled to great weight by the appellate courts. Where the testimony is conflicting, reasonable evaluations of credibility and *45 reasonable inferences of fact should not be disturbed absent clear error. In the absence of such clear error, an appellate court should adopt the trial court's findings as its own, even if other conclusions from the same evidence are equally reasonable. Trapani v. State Farm Mutual Automobile Insurance Company, 524 So.2d 226 (La.App. 5th Cir.1988), writ denied, 526 So.2d 795 (La.1988); Dixon v. Northeast Louisiana Power Cooperative, 524 So.2d 35 (La.App. 2d Cir.1988), writ denied, 526 So.2d 809 (La.1988); Ebey v. Coggins, 474 So.2d 1352 (La.App. 2d Cir.1985), and Oswald v. Rapides Iberia Management Enterprises, 452 So.2d 1258 (La.App. 2d Cir. 1984), writ denied, 457 So.2d 14 (La.1984).
Agreements legally entered into have the effect of laws on those who have formed them. It is not the province of the court to relieve the party of a bad bargain, no matter how harsh. The courts are bound to give legal effect to all contracts according to the true intent of the parties and the intent is to be determined by the words of the contract when these are clear and explicit and lead to no absurd consequences. When the terms of a written contract are clear and unambiguous, the contract cannot be varied, explained or contradicted by parol evidence. In such cases, the meaning or intent of the parties to the contract must be sought within the four corners of the instrument. Thomas v. Knight, 457 So.2d 1207 (La.App. 1st Cir.1984); Campesi v. Margaret Plantation, 417 So.2d 1265 (La. App. 1st Cir.1982), and Wilson v. Cost + Plus of Vivian, Inc., 375 So.2d 683 (La. App. 2d Cir.1979).
The lease itself may expressly provide the purpose for which the premises are leased and for restrictions on the use of the leased premises. In his occupancy of the property, the tenant is obligated not to use the premises for a purpose inconsistent with that contemplated by the parties at the time they confected the lease. The dissolution of a lease is subject to judicial control and will be decreed only when the lessor is clearly entitled to it as lease cancellation is not favored in Louisiana law. State courts, on the basis of equity, are vested with discretion under some circumstances to decline to grant a lessor cancellation of the lease although such a right appears to be otherwise available to him. Housing Authority v. Burks, 486 So.2d 1068 (La.App. 2d Cir.1986); URS Rental Services Company v. Dongieux, 480 So.2d 1034 (La.App. 5th Cir.1985), and Housing Authority of St. John v. Shepard, 447 So.2d 1232 (La.App. 5th Cir.1984).

Assignment of Error No. 1
Plaintiffs argue the trial court erred in failing to find that lessees were in default for violation of the terms of the ground lease where the ground sublease between the lessees and Midas allowed the subtenant to construct, own and have title to the buildings placed on the leased premises, which default was not cured by lessees after notice and demand.
Plaintiffs point to Paragraph V(E) of the lease which provides in pertinent part that throughout the term of the lease the lessees shall have perfect title in and to all buildings and improvements thus erected, located or constructed in or upon the leased premises. Paragraph V(G) of the lease provides that at the end of the lease, whether by expiration, termination, cancellation or otherwise, the title to all buildings and improvements in or upon the leased premises shall vest in the owners of the leased premises without the requirement of further consideration or the payment of other compensation whatsoever. Paragraph V(H) of the ground lease provides that throughout the term of the lease the lessees shall have the full and absolute authority to grant subleases, subassignments, store space leases or subleases, licenses, franchises, and other such tenancies and rights of occupancy or use as though lessees were owners, rather than principal lessees, of the leased premises.
The sublease with Midas Realty Corporation specifically provided that all improvements placed upon the premises would at all times during the term of the lease or any extension thereof be deemed personal movable property of the lessee in which no ownership or other rights vested in the lessor. At the expiration of the term of the *46 lease or upon termination of the lease for cause, the lessee would relinquish and abandon to the lessor without reimbursement all improvements made to or placed upon the premises including all buildings and permanent installations.
Plaintiffs argue that allowing Midas Realty Corporation to own all improvements placed upon the property pursuant to the sublease with defendants is a clear violation of the provisions of the original ground lease which mandate that defendants shall maintain perfect title in and to all buildings and improvements upon the leased premises. The primary thrust of plaintiffs' argument is that the language of the ground lease prohibited ownership of buildings on the leased premises by anyone other than defendants and the breach of this obligation by defendants caused damage to plaintiffs by reducing the rental it was entitled to receive from the gross square footage. We disagree.
As noted above, the pertinent language of the lease provided that lessees shall have perfect title in and to all buildings and improvements erected on leased premises. The unambiguous import of this provision is that the right of ownership of the buildings is vested in lessees and not the lessors. Even though lessees are given the right to own the improvement, this does not preclude the relinquishment of that right to a subtenant. This interpretation is buttressed by a literal reading of Paragraph V(H) of the ground lease which gave defendants-lessees the full and absolute authority to grant subleases and to undertake other rights of occupancy and use as though lessees were full owners of the property. A full owner is entitled to permit a lessee to maintain separate ownership of the improvement. Thus by placing defendants in the position of owner the lease can reasonably be construed to permit separate ownership by Midas.
Plaintiffs' assertion that separate ownership of the improvements by Midas impaired lessors' right to collect percentage rentals on the improvements to the property is also without merit. Paragraph III(C) of the lease permits lessors to collect ten percent of the amount by which lessees "Adjusted Gross Receipts" for each calendar year exceed $3.25 per "Gross Square Feet of Improvements" on the leased premises. The preamble of the lease defines "Gross Square Feet Of Improvements" in part as the "aggregate of the square footage contained in all buildings and improvements erected or placed upon the leased premises pursuant to this lease...." (Emphasis added). This provision allows plaintiffs to collect their portion of the rent on all square footage of those improvements regardless of who erects and/or owns those improvements. Therefore, the fact that the Midas building is owned by someone other than defendants does not alter defendants' obligation to pay percentage rentals when that clause is triggered. Thus, the separate ownership of the building does not impair the lessors' right to collect percentage rentals.

Assignment of Error No. 2
Plaintiffs argue the trial court erred in holding that lessees had complied with the insurance requirements and were thus not in violation and default of the lease.
Paragraph IV(B) provides in pertinent part that throughout the term of the lease, the lessees shall maintain a policy or policies of "all risk" insurance insuring the interest of lessors as they may appear or naming lessors as an additional insured party. In connection with such coverage, lessees were to maintain insurance sufficient to satisfy the requirements of any mortgage or mortgages covering the buildings or improvements on the leased premises. The lessee could satisfy the insurance requirement of the lease by delegation of the insurance responsibility to tenants or occupants of the buildings and improvements on the leased premises, but in doing so lessees would not be relieved of the primary responsibility to lessors for continual maintenance of the required insurance coverage. The lease provided that said insurance would have limits of not less than $1,000,000. The lease further required that lessees furnish or cause to be furnished to lessors a memorandum copy of *47 each policy of insurance when originally issued and of each endorsement thereto and upon each renewal of any such policy.
Plaintiffs argue that defendants' policies for comprehensive general liability coverage were for less than $1,000,000 until 1986 and that the testimony at trial established the insurer had never issued any certificates of insurance to plaintiffs nor sent them a memorandum copy of any liability policy. Further, no endorsement in the name of Alice Bell McCrary or the McCrary heirs was made in any of the policies.
The trial court found that the liability policies for Park South Properties, Midas and First National Bank established that the property and the improvements constructed on it were properly insured from January 1, 1975 through the date of trial. The trial court further noted that plaintiffs' default letter raised no questions about the existence of insurance.
Plaintiffs' assertion that defendants failed to maintain "all risk" insurance of $1,000,000 is without merit. Although defendants did not carry a policy providing $1,000,000 in coverage until 1986, the record reflects that the combined limits of the policies maintained by defendants and its sublessees always exceeded $1,000,000. As the lease agreement permitted defendants to delegate their insurance responsibility to their sublessees, the trial court properly concluded that the combined limits of the policies satisfied defendants' insurance obligations.
Plaintiffs also argue that defendants breached the lease by failing to include plaintiffs as an additional insured party in the policies and in failing to provide plaintiffs with certificates of insurance. Although the trial court did not discuss these arguments in detail, it did specifically note that the insurance issue was not addressed in plaintiffs' notice of default. We interpret this reference by the trial court to mean that plaintiffs did not satisfy their obligation to give notice of default as required by the lease.
Paragraph VIII(A) of the lease provides that lessors shall take no action or have any cause or right of action based upon or arising out of any breach of the lease unless or until lessors have given lessees notice of the breach and allowed lessees 30 days to cure the breach. That provision further states that any purported breach of the lease would require a "formal, written `placing in default' in the form required for Notice." The preamble of the lease defines Notice as a written communication delivered in person or sent by certified mail.
Plaintiffs' original notice of default was sent by certified mail but made no reference whatsoever to the insurance issue and thus did not constitute proper notice of default on that issue. There were two other subsequent letters from plaintiffs' counsel to defendants' counsel wherein plaintiffs made an informal request for copies of the insurance certificates but neither of these letters addressed the alleged failure of defendants to list plaintiffs as an additional named insured party. The content of these two subsequent letters was not sufficient to constitute a notice of default on the insurance issue and the record does not indicate they were properly delivered in accordance with the terms of the lease. As defendants did maintain the proper limits of insurance coverage and were never placed in default on the insurance issues, the trial court did not err in refusing to terminate the lease for breach of the insurance obligation.

Assignment of Error No. 3
Plaintiffs argue the trial court erred in holding that lessees complied with the obligation of the ground lease to provide the required certified statement of rentals, receipts and other income. Paragraph III(E) of the ground lease provides in pertinent part that in each calendar year, on or before the first day of March, lessees shall furnish to lessors a certified statement of rentals, receipts and other income derived from the occupants of the leased premises, whether or not lessees deem any percentage rentals to be due.
After examining the evidence, the trial court found defendants had submitted a *48 list of annual income from First National Bank and Midas to plaintiffs for the years 1981-1984. Further, plaintiffs had copies of the subleases with full knowledge from 1975 through the date of trial as to the actual rentals received by defendants from the two sublessees.
The record reflects and the trial court found that defendants had provided to plaintiffs copies of the two subleases within a short time after the inception of those subleases. As the rentals due under those subleases were clearly expressed in those documents, it is evident plaintiffs were always aware of the precise amount of the annual rentals received by defendants. Further, there was apparently some correspondence between the representatives of the parties wherein defendants specifically confirmed the amount of rentals received by it. Considering this evidence, we cannot say the trial court was clearly wrong in concluding defendants had satisfied their obligation to report rental income. In any event, because plaintiffs were fully aware of all rental income received by defendants each calendar year and there is no evidence of any unreported income having been received by defendants, we find plaintiffs were not prejudiced by any minor deficiencies in defendants' compliance with the reporting requirement contained in the ground lease.

Assignment of Error No. 4
Plaintiffs argue the trial court erred in holding that no development of the leased premises by lessees was required. We disagree.
A reading of the written opinion of the trial court indicates the court did not hold that lessees were not required to develop the property but found that under the lease provisions, the parties intended for defendants to have substantial flexibility in development of the property in exchange for the security of rental provisions which plaintiffs skillfully negotiated.
Having considered the explicit language of the lease and the testimony presented at trial, we find that lessees had no time limit on their obligation to develop the property nor have lessees acted unreasonably in their development decisions.
In Paragraph V of the lease, the parties acknowledge that "the principal cause of this agreement is the commercial development of the leased premises for the mutual benefit of the LESSOR and the LESSEE"... (Emphasis added). Further paragraph V(D) provides that lessees were authorized "as fully as though it were owner of the premises, to construct, locate or erect, or cause to be constructed, located or erected in, on, or above the leased premises, any and all commercial buildings, structures, and improvements, in such sequence of erection or construction, at such times, and at such particular locations within the leased premises as LESSEE in its discretion shall determine." The language of these portions of the lease appear to place no time limits on lessees' obligation and/or right to develop the property and no such limits are contained elsewhere in the lease. As found by the trial court, both sides to the lease entered into extensive negotiations to draft the provisions of the lease and were represented by highly competent attorneys well-versed in real estate law. Further, the lease specifically provides in Paragraph IX(A) that the ground lease and its attachments constitute the entire agreement between the parties. Thus, had the parties intended to impose a timetable for the development of the property such a requirement would have been expressly stated in the lease.
Having found the time frame for development of the property was within the sole discretion of the lessees, we further note there was ample evidence presented at trial that defendants had not acted unreasonably in their decisions as to the development of the leasehold premises. The evidence indicated commercial development of the property would have been unwise shortly after the execution of the lease until South Park Mall had been fully leased. After this period, peripheral development around the Mall would have been the most successful.
*49 As noted above, commercial development was to be for the mutual benefit of the parties. Obviously any commercial development is beneficial to plaintiffs as they would receive a portion of the rents without incurring any construction or maintenance costs. But for any commercial development to be beneficial to defendants, it must offer a reasonable likelihood of commercial success and profitability. Therefore, as the lease contemplates only mutual beneficial development, the lessees are only required to undertake development which has a reasonable possibility of commercial success and are entitled to delay development until economic conditions for such development are favorable.
Plaintiffs argue the liquidated damages clause contained in Paragraph VII(A) of the ground lease further supports a finding that the parties contemplated immediate development of the property would be undertaken after execution of the ground lease. The provision called for liquidated damages in the amount of $50,000 in the event the project involving the initial demolition, site preparation and construction of commercial improvements on the leased premises should be abandoned or lessors should cancel the lease by reason of lessees' breach thereof at any time between the time of commencing site preparation and demolition of the existing improvements and the time of substantial completion and occupancy of commercial improvements on the leased premises aggregating at least 100,000 gross square feet. We do not agree with plaintiffs' contention this provision imposes an obligation of immediate development on defendants. This provision appears to be intended to compensate plaintiffs for any damage done to the leased premises should lessees abandon the lease or abandon the development before completion and certainly did not impose any specific obligation of immediate development.

Assignment of Error No. 5
Plaintiffs argue the trial court erred in failing to consider all the provisions of the lease agreement in toto and, instead, in basing its decision on one subparagraph of the ground lease.
Although the trial court did refer to specific provisions of the lease to address specific problems, it appears clear from an examination of the entire written opinion of the trial court that it gave due weight to the entire lease in deciding the merits of the issues. Based upon our review of the record and all provisions of the ground lease, we do not find the trial court erred in its interpretation of the lease.

Assignments of Error No. 6 and 8
Plaintiffs argue the trial court erred in finding the notice of default sent by lessors to lessees constituted a cloud on lessees' leasehold title thus preventing lessees from properly developing the leased premises and entitling lessees to a suspension and extension of the primary term of the lease. Plaintiffs further argue the trial court erred in not requiring lessees to pay rent or ad valorem taxes, allowing lessees to collect and retain rentals and taxes from subtenants without any payments to lessors and entitling lessees to a credit for rents and taxes paid during the period August 10, 1981 through July 31, 1983.
After examining the evidence, the trial court found that due to the cloud on defendants' leasehold title because of plaintiffs' unfounded default letter, defendants were prevented from commercially developing the property as expressly and contractually guaranteed by the original ground lease since the date of the default letter. The court found defendants were entitled to an extension of the unexpired time period of the lease until the date this litigation was finally adjudicated and lessors were not entitled to any rentals received by lessees from the subtenants during the time the lease was suspended nor were lessees obligated to pay the base rentals provided for in the ground lease. Further, defendants were granted a credit for base rent and ad valorem taxes paid by it.
Plaintiffs contend the default letter did not constitute a cloud on defendants' title so as to justify a suspension and extension of the lease term. In making this *50 argument, plaintiffs ignore the principal purpose of the lease agreement which is relied upon in previous arguments. The ultimate goal of the lease agreement was the long-term commercial development of the property. Such long-term development will require the construction and erection of significant and valuable improvements. The threat of the immediate termination of the ground lease would discourage if not absolutely preclude such long-term development. One could not expect a reasonable businessman to commit significant funds to the construction of a building when the ground lease was under the threat of premature termination. Therefore, it is clear that the default letter was a breach of the peaceable possession and use of the leased premises by defendants and constituted a cloud on defendants' leasehold title. This finding was supported by testimony at trial that defendants were unable to obtain title insurance or secure tenants following the default letter. The evidence also indicated that the early 1980's when the default letter had been sent would have been the optimal period for the development of this property as South Park Mall had been fully leased and matured and the area was ripe for peripheral development.
The trial court suspended and extended the lease during the pendency of the suit in an effort to fashion an equitable remedy which would place the parties as nearly as possible in the position they occupied prior to the interruption of defendants' peaceable possession by the lessors. The effect of the suspension of the lease is that lessees had no obligation to pay base rent or ad valorem taxes during the period of suspension. However, because the lease has been extended for a period of time equal to the length of suspension, the lessors will ultimately collect the full 50 years of rent and payment of ad valorem taxes for which they contracted. As defendants were unable to develop the property during the pendency of the dispute, we find no abuse of discretion by the trial court in suspending the lease, thereby allowing defendants additional time to develop the property and in holding that during the time of suspension, lessees were not liable for payment of rent or ad valorem taxes.
Plaintiffs also argue defendants were unjustly enriched by the suspension of the lease since they were allowed to collect significant rents from subtenants while paying no base rent to plaintiffs or ad valorem taxes. We disagree. As the lease has been extended, the lessees will be obligated to pay base rentals for nearly ten years beyond the term originally contemplated by the parties. The lessees are obligated to pay that base rent regardless of the amount of rent, if any, they receive from subtenants who own and/or occupy the improvements on the leased premises.

Assignment of Error No. 7
Plaintiffs argue the trial court erred in accepting F. Truly as an expert witness in the area of commercial development of property.
It is well-settled that the decision whether a person is qualified as an expert is within the sound discretion of the trial court. The appellate courts will not reverse absent a finding that the decision of the trial court is clearly erroneous. Experience alone is sufficient to qualify a person as an expert. Belk v. Montgomery Ward and Company, Inc., 501 So.2d 1008 (La. App. 2d Cir.1987), and Ealy v. Bill Allen Dodge, Inc., 466 So.2d 52 (La.App. 2d Cir. 1985).
The record reflects that Mr. Truly was tendered by defendants as an expert in commercial real estate and in the development of commercial real estate projects. Truly stated he had been engaged in the business of commercial real estate for some 30 years, including development of shopping centers and projects located in the Mansfield Road area. The witness was questioned as to his qualifications extensively by plaintiffs' counsel and upon conclusion of the questioning the trial court noted that, based upon the nature of the inquiries made on direct and cross-examination, there was a sufficient basis for it to determine that the witness could testify in *51 an expert capacity with respect to commercial real estate and development.
After reviewing the record, specifically the considerable experience of the witness in the development of shopping centers and property located in the Mansfield Road area, we find the trial court did not err in accepting Truly as an expert witness in this area.

Assignment of Error No. 9
Finally, plaintiffs argue the trial court erred in failing to cancel the ground lease between it and defendants and in failing to award liquidated damages to plaintiffs-lessors.
This assignment of error, which has been adequately addressed in response to plaintiffs' previous arguments, is without merit.
Decree
For the reasons set forth, the judgment of the trial court is AFFIRMED, at plaintiffs' costs.